**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-3230
_____

UNITED STATES OF AMERICA,

Appellant

v.

EDWARD STEARN, AKA EXTRA, JOSEPH DOEBLEY,
AKA MAXI, and MICHAEL DOEBLEY, AKA MIV,

Appellees

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
Criminal Action 06-00203

District Judge: Honorable Juan R. Sanchez

_____

Argued September 9, 2009

_____

Before: SCIRICA, <u>Chief Judge</u>, RENDELL and ALDISERT,
<u>Circuit Judges</u>
(Opinion Filed: March 9, 2010)


DAVID J. IGNALL (ARGUED)
KATHY A. STARK
U.S. Attorney's Office
615 Chestnut St.
Suite 1250
Philadelphia, PA 19106

      Attorneys for Appellant

ARNOLD C. JOSEPH (ARGUED)
JOSEPH & ASSOCIATES
6198 Butler Pike Ste 135
Bluebell, PA 19422

      Attorneys for Appellee Edward Stearn

ELLIOT M. COHEN (ARGUED)
LOUIS T. SAVINO, JR.
LOUIS T. SAVINO AND ASSOCIATES
Suite 1516
Two Penn Center Plaza
15th and John Fitzgerald Kennedy Boulevard
Philadelphia, PA 19102

      Attorneys for Appellee Michael Doebley

GERALD A. STEIN (ARGUED)
1500 Market Street
Suite 2727, Centre Square West
Philadelphia, PA 19102-2146

Attorney for Appellee Joseph Doebley

_____

OPINION OF THE COURT
_____


ALDISERT, Circuit Judge.

The United States Government appeals the order of the District Court for the Eastern District of Pennsylvania granting in part motions to suppress evidence in favor of Defendants Joseph Doebley, Michael Doebley and Edward Stearn.[1] In its memorandum and order, the District Court suppressed evidence seized pursuant to seven warrants because (1) four warrants lacked probable cause and three additional warrants were "fruits of the poisonous tree," and (2) the warrants' "bare bones" supporting affidavits rendered inapplicable the Leon exception for "good faith" reliance on a search warrant. See United States

_____

[1]The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have appellate jurisdiction pursuant to 18 U.S.C. § 3731.

3

v. Leon, 468 U.S. 897, 926 (1984). Moreover, although the Government objected that each defendant lacked a legitimate expectation of privacy in some of the searches, the District Court suppressed evidence as to each defendant without resolving the Government's so-called "standing" challenges.[2] See Rakas v. Illinois, 439 U.S. 128, 140, 143 (1978). On appeal, the Government contends that the District Court erred in all three respects.

Except for the search of 5020 Homestead, from which no evidence was seized,[3] we will reverse the District Court's order

---

[2]At times we will employ the term "standing" as "shorthand for the determination of whether a litigant's Fourth Amendment rights have been implicated." See United States v. Mosley, 454 F.3d 249, 253 n.5 (3d Cir. 2006) (citation omitted). We use the term to facilitate reference, but with the understanding that the inquiry actually turns on the presence or absence of the defendant's legitimate expectation of privacy in the place searched.

[3]The Government appeals the District Court's entire order, which suppressed evidence seized pursuant to the warrant to search 5020 Homestead. But because no evidence was seized at this location, this point is moot. Cf. United States v. Garrett, No. 4:08CR00703, 2009 WL 1086974, at *6 (E.D. Mo. Apr. 22, 2009) ("Because there is no evidence to suppress, defendant's motion to suppress evidence will be denied, as moot."); cf. also, e.g., United States v. Taylor, 599 F.2d 832, 837 n.1 (8th Cir.

in its entirety. As set forth below, the magistrate judge had a substantial basis for determining that probable cause existed to search 4049 Higbee, the apparent residence of a confirmed drug dealer, and we will uphold the search on that basis. Closer probable cause questions are presented by the searches of 5019 Homestead, 5022 Homestead, 5034 Homestead and 5038 Homestead, which had discernible, but less direct connections to the defendants' alleged drug activities. Without deciding these probable cause questions, we will uphold each search under the Leon good faith exception, as each warrant was sufficiently colored in probable cause to justify the executing officers' good faith reliance. Finally, because we reject Stearn's Fourth Amendment challenge to the search of 5019 Homestead – his only challenge to the property searches – we also reverse the District Court's suppression of Stearn's saliva sample as "fruit of the poisonous tree," as he failed to prove a "primary" invasion of his own Fourth Amendment rights. See United States v. Smith, 522 F.3d 305, 306 n.2 (3d Cir. 2008).

Because this appeal requires a considered study of Fourth Amendment precepts – a study driven by complicated facts involving three defendants and warrant-based searches of six residences, a garage and two motor vehicles – our analysis, of necessity, is protracted.

---

1979); United States v. Franklin, No. CRIM. A. 04-10117RWZ, 2005 WL 2177120, at *1 (D. Mass. Sept. 9, 2005).

I.

On October 6, 2005, Officer Ryan, a veteran of the Philadelphia Police Department's narcotics unit, submitted an affidavit in support of search warrants for six locations in Philadelphia, Pennsylvania. Officer Ryan submitted a second affidavit on October 7, 2005, seeking search warrants for additional locations. Because no party presented evidence outside the affidavits themselves, our "factual" discussion is drawn almost entirely from the affidavits.[4] (App. 158-160.)

A.

According to his October 6 affidavit, Officer Ryan received a tip from a confidential informant on September 28, 2005 that implicated Joseph Doebley, Michael Doebley and Edward Stearn in drug distribution crimes in the city of

_____

[4]Neither the parties' briefs nor the Appendix are clear as to the date the warrant issued for Stearn's blood and/or saliva, and no party furnished us with a copy of the warrant. As far as we can tell, that warrant issued approximately one week after the initial searches and some time after that, a saliva sample was collected from Stearn. Because Stearn sought to suppress his saliva sample only as fruit of the poisonous tree (and made no other argument concerning probable cause), we confine ourselves to the issue whether Stearn's saliva sample was fruit of the poisonous tree. (See App. 108.)

Philadelphia.[5] Specifically, the informant told Ryan that Joseph Doebley sells cocaine powder in weight with his brother Michael Doebley and that Edward Stearn was Joseph Doebley's supplier. (App. 88.) The informant also told Ryan that Joseph Doebley operated his cocaine business from his house on the 4000 block of Higbee Street and a garage on the 4800 block of Comly Street, which he had converted to a gym. According to the informant, Joseph Doebley operated a rust-colored Chevrolet Impala and blue-and-white pickup truck with fancy rims.

In the subsequent week, officers corroborated many details of the informant's tip through investigation and surveillance. On September 28, the day Ryan received the tip, officers located the gym at 4808 Comly and observed a blue-and-white pickup truck with fancy rims parked in the gym's side yard. Police officers additionally verified that Joseph Doebley was the listed owner of 4808 Comly and learned that Jane Betty Doebley owned 4049 Higbee. That evening, officers observed Joseph Doebley exit 4808 Comly and depart in the Chevrolet

---

[5]In relating the officers' observations, Officer Ryan's affidavits sometimes record observations of "Doebley," without specifying whether Joseph or Michael was observed. On our reading, it appears that officers used the name "Doebley" to refer to Joseph Doebley, and typically referred to Michael Doebley using his full name. Read in context, the affidavits leave almost no doubt as to which Doebley was under observation at any given time.

Impala. Soon thereafter, officers watched Doebley sell a 3.5-gram baggie of cocaine, in a controlled buy, from the inside of his Impala.

During surveillance on October 4 and 5, police officers confirmed Joseph Doebley's drug involvement and tracked his movements among several properties in the neighborhood. On October 4, a white male exited 4808 Comly, spoke with Joseph Doebley in the side yard, drove to the intersection of Cheltenham and Hegerman, and completed a sale of approximately 3.5 grams of cocaine from inside his car. The white male returned to 4808 Comly and counted out and delivered currency to Doebley, who entered 4808 Comly and departed after a brief stay. Later that evening, Doebley left 4808 Comly in the blue-and-white pickup truck, and approximately two hours later, arrived at 5038 Homestead. He remained there for two hours. After a brief stop at 4808 Comly, Doebley was next observed as he parked in a rear driveway near 4049 Higbee at approximately 11:50 p.m. He entered the rear yard of 4049 Higbee, which contained a pit bull, and entered the attached garage through a rear door. Police terminated surveillance shortly thereafter, but at 7:15 a.m. the next morning, officers observed that the pickup truck remained parked in the rear of 4049 Higbee. According to the affidavit, property records listed Ruth Nolan as the owner of 5038 Homestead, and listed 4049 Higbee as a co-owner address. The affidavit did not name the co-owner. Police also learned that the water bill for 5038 Homestead was mailed to 4049 Higbee.

8

The affidavit next recounts the officers' October 5 observations of Joseph and Michael Doebley as they moved among several properties on Homestead Street and the 4808 Comly gym. That afternoon, officers observed Michael Doebley leave 5019 Homestead, drive to 4808 Comly, depart with Joseph Doebley, and arrive at 5019 Homestead, which both men entered. Joseph Doebley then left 5019 Homestead, entered 5022 Homestead and returned to 4808 Comly with an unidentified white male. Joseph Doebley then drove back to Homestead Street and entered 5019 and 5017 Homestead, subsequently using keys to enter both 5022 and 5028 Homestead. Doebley then met with a white female, entered 5030 Homestead and remained there for approximately one hour. Thereafter Doebley returned to 5022 Homestead. According to real estate records, 5019 Homestead was owned by Edward Stearn, who had three prior drug distribution arrests. Michael Doebley had two prior drug distribution arrests.

Officer Ryan submitted an affidavit on October 6, alleging that the foregoing facts established probable cause to search 4049 Higbee, 4808 Comly, 5017 Homestead, 5019 Homestead, 5022 Homestead and 5038 Homestead. A judge of the Pennsylvania Court of Common Pleas reviewed the affidavit and issued each of the warrants requested. On October 6, officers executed all warrants, except for the warrant to search 5017 Homestead. (See App. 96.) The results were reported in Officer Ryan's second affidavit, the details of which follow.

9

B.

On October 7, 2005, Officer Ryan submitted a second affidavit seeking warrants to search 5020 Homestead and 5034 Homestead, the rust-colored Chevrolet Impala and the blue-and-white pickup truck. This affidavit incorporated the first affidavit, detailed the results of additional surveillance, and reported the results of the October 6 searches. (App. 95-97.)

On the morning of October 6, FBI and IRS agents raided Dangerous Curves Gentlemen's Club at Homestead Street and State Road, adjacent to the 5000 block of Homestead Street. At 3:15 p.m., a confidential informant arranged another controlled purchase from Joseph Doebley, but the purchase was not consummated. At approximately 3:30 p.m., federal agents left the Gentlemen's Club, and "[s]hortly after that," Edward Stearn, Michael Doebley, and one Chris Simon left 5019 Homestead and entered 5020 Homestead. (App. 96.) Thereafter, Michael Doebley entered and exited 5022, 5038 and 5034 Homestead in a short span of time, and he returned to 5022 Homestead. Edward Stearn then departed 5022 Homestead, entered 5019 Homestead, exited carrying clothes and a bag, and entered a black truck. At the same time, Michael Doebley left 5022 Homestead carrying white trash bags and entered a grey Jeep Cherokee. Both vehicles departed at the same time. According to the affidavit, young white males exited 5019 Homestead and 5038 Homestead, and they "fled East bound" with backpacks. (App. 96.) Shortly thereafter, highway patrol units stopped

Michael Doebley's Jeep, detained him, and found large amounts of cash on his person. Officers also pursued Edward Stearn, but lost him.

According to the affidavit, officers subsequently executed the warrants for 4049 Higbee, 4808 Comly, 5019 Homestead, 5022 Homestead and 5038 Homestead, but not 5017 Homestead. (App. 96.) At 4049 Higbee, officers found marijuana, packaging material, a firearm and documents in Joseph Doebley's name. At 5019 Homestead, officers found proof of residence for Edward Stearn, mail for Michael Doebley, bulk cocaine powder, marijuana, pills and U.S. currency. At 5022 Homestead, officers found marijuana and packaging, and may have also found documents for Michael Doebley.[6] At 5038 Homestead, officers found an estimated eight kilograms of cocaine in bricks and smaller units, approximately 15 handguns and proof of residence for Michael Doebley. Officers also executed the warrant for 4808 Comly, but nothing was found nor taken. (App. 96.)

Pending the application for the additional warrants, officers secured the premises at 5020 Homestead and 5034 Homestead and seized the blue-and-white pickup truck and the

_____

[6]According to the affidavit, "Marijuana and packaging was recovered for Michael Doebley." (App. 96.) Although it appears a typo or omission was made, this may suggest that some type of documents were found for Michael Doebley.

11

rust-colored Chevrolet Impala. (App. 96.) Just before officers secured 5034 Homestead, a white female identified herself as Sophia Beltz and told officers she was the owner. (Id.) When asked for keys to the property, Beltz stated she would not know who had keys, and she told officers that Michael Doebley was the only person inside the property. (App. 96-97.)

After reviewing Ryan's second affidavit, a Philadelphia bail commissioner issued warrants for 5020 Homestead and 5034 Homestead, the pickup truck and the Chevrolet Impala. In the ensuing searches, officers recovered marijuana and grinders from 5034 Homestead, and they found one ounce of cocaine and packaging material in the pickup truck. Nothing was found nor taken from 5020 Homestead or the Chevrolet Impala. (App. 91, 94.) Approximately one week later, Officer Ryan apparently obtained a warrant to collect blood and saliva from all three defendants. (See Appellant's Br. 18; App. 104.) Although we are not certain of the timeline, saliva was collected from Defendant Stearn sometime after his arrest.

II.

On April 26, 2006, a federal grand jury charged Joseph Doebley, Michael Doebley and Edward Stearn with federal narcotics and weapons offenses.[7] Defendant Joseph Doebley

_____

[7] The grand jury returned an indictment, charging Edward Stearn, Joseph Doebley and Michael Doebley with one count

12

filed a motion to suppress evidence seized from 4808 Comly, 4049 Higbee, 5019 Homestead, 5022 Homestead, 5034 Homestead, 5038 Homestead and the blue-and-white pickup truck. Defendant Stearn filed a motion to suppress evidence seized from 5019 Homestead and the saliva sample taken after his arrest. Michael Doebley filed a motion to join and adopt Joseph Doebley's motion to suppress. (App. 131, 153.)

In its consolidated response, the Government argued that the searches were valid under Leon because they were executed in good faith reliance on validly issued warrants. The Government additionally argued that probable cause supported each search, and that in any case, not all defendants had

---

each of conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846; possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1); possession of firearms in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1); and possession of firearms by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). The indictment also charged Joseph Doebley with one count of distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1). On September 13, 2006, the grand jury returned a superseding indictment, which added an additional charge against Edward Stearn for possession of a controlled substance with intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

13

"standing" to challenge each of the disputed searches.[8] The Government conceded that Fourth Amendment challenges could be maintained by: Joseph Doebley as to 4808 Comly, 4049 Higbee and 5038 Homestead; Michael Doebley as to 5022 Homestead and 5034 Homestead; and Edward Stearn as to 5019 Homestead.[9] The Government maintained, however, that each Defendant lacked "standing" to challenge the search of any other premises.

## A.

At the suppression hearing on April 10, 2008, the Government reasserted its "standing" challenges, but suggested that the Court proceed "in the reverse order" and address the

---

[8]Specifically the Government argued that Joseph Doebley lacked a legitimate expectation of privacy in 5019 Homestead, 5022 Homestead, 5034 Homestead and 5038 Homestead. It argued that Michael Doebley lacked a legitimate expectation of privacy in 4049 Higbee, 5019 Homestead, 5022 Homestead, 5038 Homestead or Joseph Doebley's car. The Government acknowledged that Edward Stearn challenged only the search of 5019 Homestead, "which was his home." It conceded Stearn's right to challenge that search. (App. 135.)

[9]The Government made these concessions in its briefs, except for the concession that Joseph Doebley had a legitimate expectation of privacy in 5038 Homestead, which was made at the outset of the suppression hearing. (See Appellant's Br. 74-75; see also App. 135, 156-157.)

14

probable cause issue first. (App. 157.) In the Government's view, that procedure was more expedient because it would "moot any standing issues" and obviate the need for testimony or proof on "standing." (App. 157.) The District Court and the defendants agreed, and the hearing proceeded on the issues of probable cause and the Leon good faith exception. Each defendant declined the Court's invitation to present testimony or evidence outside the affidavits. (App. 158.) Once argument began, neither the parties nor the Court returned to the issue whether each defendant had a legitimate expectation of privacy in each of the properties searched. (App. 164-192.) At the close of argument, the Court took the matter under advisement.

On April 25, 2008, the District Court granted in part the defendants' motions to suppress. See United States v. Stearn, 548 F. Supp. 2d 182, 193-194 (E.D. Pa. 2008). Although the Court acknowledged its duty to accord great deference to the magistrate judge's probable cause determination, the Court demurred with respect to four of the October 5 warrants, stating:

I am unable to find sufficient evidence of probable cause within the four corners of the affidavit to support the search warrants for 4049 Higbee Street, 5022, 5019, and 5038 Homestead Street. The affidavit contains not a shred of evidence regarding the reliability of the "informant," no exchanges are witnessed in the vicinity of the houses on Homestead or Higbee streets, no buys were made from or near the houses, and no one was seen leaving any of the houses before going to a drug sale.

15

Id. at 192. The Court expressed serious concerns about the informant's credibility, finding that "the affidavit provides no assertion the officers believed the confidential informant, no history of past cooperation by the informant, no drug buys by the informant, and no inside information supplied by the informant." Id. at 190. Because the affidavit failed to establish meaningful corroboration, the informant's tip did not support probable cause that Joseph Doebley, Michael Doebley and Edward Stearn were drug dealers. Id. at 190, 192.

In addition, Joseph Doebley's documented drug transactions afforded probable cause to search the 4808 Comly gym and the two vehicles, but not 4049 Higbee, 5019 Homestead, 5022 Homestead or 5038 Homestead. Id. at 192-195. The Court observed that because the "only two drug sales documented in the affidavits had . . . a . . . nexus to 4808 Comly Street," the affidavit established probable cause to search that location. Id. at 193. Likewise, Doebley's drug sales established probable cause to search the blue-and-white pickup truck because, according to the affidavit, officers observed him driving that vehicle. Id.

By contrast, the Court ruled that probable cause did not exist to search the Higbee or Homestead properties because the affidavit failed to connect any of those locations with drug activity. Id. at 192. In so ruling, the Court rejected the Government's argument that probable cause was established

16

through <u>Whitner</u> and its progeny, which permit a magistrate to infer that a drug dealer is likely to use his home as a "stash house." <u>Id.</u> at 191 (<u>citing</u> <u>United States v. Whitner</u>, 219 F.3d 289, 292 (3d Cir. 2000)).[10] In the Court's view, that inference was available only where the affidavit suggested large-scale operations or described drug sales in the immediate vicinity of a dealer's home. <u>Id.</u> (<u>citing</u> <u>Burton</u>, 288 F.3d at 105; <u>Hodge</u> 246 F.3d at 306; <u>Whitner</u>, 219 F.3d at 292). Because Ryan's affidavit detailed only small drug transactions and revealed no drug sales in the immediate vicinity of the Higbee or Homestead properties, <u>Whitner</u> and its progeny did not support a finding of probable cause. <u>Id.</u>

Because it found the affidavit's defects so severe, the Court perfunctorily declined to apply the <u>Leon</u> "good faith" exception to the exclusionary rule. <u>Id.</u> n.5 (<u>citing</u> <u>Leon</u>, 468 U.S. at 922). In a three-sentence footnote, the Court ruled <u>Leon</u> inapplicable because "the defects in this case were in the affidavits to establish probable cause," and because those affidavits were "bare bones." <u>Id.</u>

The Court then excluded as fruits of the poisonous tree

---

[10]<u>See also</u> <u>United States v. Burton</u>, 288 F.3d 91, 104 (3d Cir. 2002); <u>United States v. Hodge</u>, 246 F.3d 301, 306 (3d Cir. 2001); <u>United States v. Jones</u>, 994 F.2d 1051, 1056 (3d Cir. 1993).

17

all evidence seized pursuant to the September 6 warrants for 5020 Homestead, 5034 Homestead and Stearn's saliva sample. Id. at 193-195. All told, the District Court suppressed the evidence seized from 4049 Higbee, 5019 Homestead, 5020 Homestead, 5022 Homestead, 5034 Homestead and 5038 Homestead, as well as Stearn's saliva sample. (App. 22, 25.) Id. The Court denied suppression only of the evidence found at 4808 Comly and in the blue-and-white pickup truck. Id.

Significantly, the Court did not limit its suppression order to those defendants possessing legitimate expectations of privacy in each property, nor did it mention the Government's so-called "standing" challenges. See id. at 194. Consequently, evidence from all seven searches was suppressed against Joseph Doebley, even though the Government raised serious concerns about his "standing" to challenge the searches of 5019 Homestead, 5022 Homestead, and 5034 Homestead. Further, although Michael Doebley merely joined in Joseph Doebley's motion to suppress without specifically alleging his own expectation of privacy in the searched properties, evidence from all seven searches was suppressed as to him. In addition, evidence from all seven searches was suppressed as to Edward Stearn, even though he challenged only the warrants for 5019 Homestead and his saliva sample.

B.

18

The Government moved for reconsideration of the issues of probable cause, good faith and "standing," but was rebuffed on all three grounds. See United States v. Stearn, No. 06-203, 2008 WL 2550582, at *1 (E.D. Pa. June 26, 2008). In its order of June 26, 2008, the Court reaffirmed its rejection of the Government's good faith and probable cause arguments, essentially for the reasons given in its original order. Id. Moreover, although the Court addressed the Government's "standing" objections, it dismissed them in a three-sentence footnote, stating:

> The Government also seeks in its brief for reconsideration to argue standing as to each of the Defendants. At oral argument, the Government conceded the standing issue was subservient to the issue of probable cause. Because I find the searches were unreasonable, the evidence will be suppressed as to each of the three Defendants.

Id. at *4 n.2. The Government timely appealed, renewing its arguments on "standing," probable cause and good faith.

III.

We first address the Government's argument that the District Court's suppression order improperly excluded evidence as to defendants who lacked legitimate expectations of privacy

19

in the places searched. Our review is "for clear error as to the underlying factual findings," and we "exercise[] plenary review of the District Court's application of the law to those facts." United States v. Perez, 280 F.3d 318, 336 (3d Cir. 2002) (citation omitted).

To invoke the Fourth Amendment's exclusionary rule, a defendant must demonstrate that his own Fourth Amendment rights were violated by the challenged search or seizure. See Rakas, 439 U.S. at 132-134. These rights are violated only if "the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." Id. at 140. Significantly, a defendant's Fourth Amendment rights are not violated by the introduction of evidence obtained in violation of a third party's rights. Id. at 134. Because Fourth Amendment rights are "personal," id. at 139, the proponent of a motion to suppress "bears the burden of proving not only that the search . . . was illegal, but also that he had a legitimate expectation of privacy in [the place searched]." Rawlings v. Kentucky, 448 U.S. 98, 104 (1980). "The 'standing' inquiry, in the Fourth Amendment context, is shorthand for the determination of whether a litigant's Fourth Amendment rights have been implicated." Mosley, 454 F.3d at 253 n.5.

When the Government conceded each defendant's "standing" to challenge one or more specified searches, it relieved each defendant of his burden of demonstrating a

20

legitimate expectation of privacy with respect to those specified searches. Indeed, because the legitimate-expectation-of-privacy inquiry is distinct from jurisdictional "standing," we honor the Government's express concessions of the rights of each defendant to challenge one or more specified searches.[11] As set

---

[11]The Government made its "standing" concessions in the District Court, and has not taken a contrary position on appeal. But because disagreement exists over whether a concession of Fourth Amendment "standing" is valid, we briefly discuss the import of these concessions.

Some of our sister Courts of Appeals reject the notion that the government may concede a defendant's legitimate expectation of privacy in a searched premises. See United States v. Bouffard, 917 F.2d 673, 677 (1st Cir. 1990) (remanding to the district court to conduct a "standing" inquiry, notwithstanding the government's concession of the defendant's "standing" in the district court and on appeal, because "there is a clear insufficiency of evidence to demonstrate that the defendant possessed a legitimate expectation of privacy"); see also United States v. Smith, 621 F.2d 483, 489 n.3 (2d Cir. 1980) ("[S]tanding is a question of law and a concession by the Government on a question of law is never binding on this Court. Thus the Government is free to argue the question of Smith's standing even if it 'conceded' it during the proceedings below." (citation omitted)). Implicit in this view is that the government either does not, or cannot, "waive" its challenge to "standing" by conceding it. See id. In these courts, the government remains free to challenge "standing" even if it conceded that issue

21

below, and a reviewing court may revisit the issue even if no party raises it on appeal. See Bouffard, 917 F.2d at 676; id. at 678 (Toruella, J., dissenting).

We believe the better view is that the government may concede a defendant's Fourth Amendment "standing," and that in doing so, it waives its right to challenge "standing" on appeal. See United States v. Amuny, 767 F.2d 1113, 1122 (5th Cir. 1985) (holding that the government "forfeited" its opportunity to challenge "standing" on appeal where it conceded "standing" in the district court); see also United States v. Cellitti, 387 F.3d 618, 623 (7th Cir. 2004). Fourth Amendment "standing" is one element of a Fourth Amendment claim, and does not implicate federal jurisdiction. See Rakas, 439 U.S. at 139. Consequently, "standing" can be conceded by the government, and it is also subject to the ordinary rule that an argument not raised in the district court is waived on appeal. See Steagald v. United States, 451 U.S. 204, 209 (1981) (warning that the government can "lose its right" to challenge "standing" "when it has made contrary assertions in the courts below . . . or when it has failed to raise such questions in a timely fashion during the litigation"); Belitskus v. Pizzingrilli, 343 F.3d 632, 645 n.11 (3d Cir. 2003). As here, when the Government concedes "standing" in the district court, it waives its right to make contrary arguments on appeal.

Nor are we obligated to revisit the "standing" issue on our own initiative. Contrary to the conclusion of the First Circuit Court of Appeals, we need not ensure that the Government's

22

forth above, the Government conceded that Fourth Amendment challenges could be maintained by: Joseph Doebley, with respect to 4808 Comly, 4049 Higbee and 5038 Homestead; Michael Doebley with respect to 5022 Homestead and 5034 Homestead; and Edward Stearn with respect to 5019 Homestead. Aside from these concessions, the Government disputed each defendant's right to challenge all other searches. No defendant established a legitimate expectation of privacy in any other location; in fact, only Joseph Doebley even asserted an expectation of privacy in additional locations.

With respect to the defendants and locations for which the Government did not concede a legitimate expectation of privacy, the District Court's exclusion order plainly ran afoul of black-letter precepts of Fourth Amendment law. Notwithstanding the Government's well-founded contention that each defendant lacked "standing" for some of the suppression

_____

"standing" concessions are supported by "evidence to demonstrate that the defendant possessed a legitimate expectation of privacy." See Bouffard, 917 F.2d at 677. We believe that view treats Fourth Amendment "standing" as a jurisdictional requirement rather than an element of a Fourth Amendment claim, and we believe it is inconsistent with Rakas. Accordingly, we acknowledge the Government's select concessions of "standing" in the district court, we deem contrary arguments waived, and we have no need to explore the concessions further.

23

motions, the Court's first order did not mention, much less analyze, whether each defendant possessed a legitimate expectation of privacy in the places searched. See Rakas, 439 U.S. at 140. Indeed, the Court apparently ordered the exclusion of evidence based on its bare conclusion that the relevant searches were illegal. The Court held:

> Because I find a number of the searches conducted on October 6, 2005 unreasonable under the Fourth Amendment, I will suppress the evidence seized during those searches. . . . In sum, any evidence seized on warrants issued for 4049 Higbee Street, 5022, 5019, 5038, 5020, and 5034 Homestead street., [sic] as well as the warrant for blood and saliva from Stearn is suppressed.

Stearn, 548 F. Supp. 2d at 193-194 (citation and quotation omitted). As the accompanying order made clear, the Court suppressed this evidence as to all three defendants, ignoring Rakas's directive that courts limit the exclusionary remedy to individuals whose own Fourth Amendment rights have been violated. Rakas, 439 U.S. at 139. For nearly forty years, the Supreme Court has unwaveringly required the proponent of a motion to suppress to "assert[] his own legal rights and interests rather than basing his claim for relief upon the rights of third parties." E.g., id. at 139. This is black-letter law.

Strikingly, the Court's across-the-board exclusion order suppressed evidence against a defendant who did not even

24

challenge its admissibility. <u>See</u> <u>Stearn</u>, 548 F. Supp. 2d at 194-195. Indeed, although Edward Stearn challenged only the warrants for 5019 Homestead and his saliva, the District Court's wholesale suppression of evidence from the other searches foreclosed the Government's use of that evidence against him as well. (<u>See</u> App. 98-108, 194-195.) The District Court thereby made the exclusionary remedy available to a defendant who did not even challenge a series of searches, much less prove an expectation of privacy therein. This, too, was a fundamental error.

We similarly disagree with the District Court's treatment of the expectation-of-privacy issue in its denial of the Government's motion to reconsider. In a footnote, the Court explained that its previous order did not resolve the "standing" question because the Government had "conceded" that issue as to all three defendants:

> The Government also seeks in its brief for reconsideration to argue standing as to each of the Defendants. At oral argument, the Government conceded the standing issue was subservient to the issue of probable cause. Because I find the searches were unreasonable, the evidence will be suppressed as to each of the three Defendants.

<u>Stearn</u>, 2008 WL 2550582, at *4 n.2. That reading is wrong. In its brief in opposition to the defendants' motions, the

25

Government conceded the "standing" of each defendant to challenge some searches and properly objected to each defendant's "standing" to challenge any other search. At the outset of the suppression hearing, the Government told the Court that its position on "standing" was reflected in its opposition papers, but conceded Joseph Doebley's right to challenge one additional search – the search of 5038 Homestead. (App. 156-157.) The Government then suggested that the hearing proceed in "reverse order" and that the Court and parties address the "probable cause issues first." (App. 157.) Quite obviously, the Government's "reverse order" language reflected its belief that the Court would not need to reach the "standing" issue because it would resolve the probable cause and good faith issues in the Government's favor. When this did not happen, the Court was obligated to address the "standing" issue anew. It was thus clear error for the Court to conclude that the Government concede" the defendants' so-called "standing" to challenge all of the disputed searches.

We conclude that the District Court erred in ordering the suppression of evidence without regard to the defendants' ability to demonstrate legitimate expectations of privacy in the locations searched. Although the District Court had discretion to decide the issues of probable cause and good faith first, see United States v. Varlack Ventures, 149 F.3d 212, 216 (3d Cir. 1998), it was required under Rakas to address the defendants' Fourth Amendment "standing" for the searches it ultimately determined were unreasonable. Its failure to do so was an

26

egregious error.

Notwithstanding the District Court's failure to address the defendants' so-called "standing" to challenge the searches, we cannot resolve this case on Rakas's "standing" prong alone. Because we recognize the Government's express concessions that each defendant had "standing" to challenge one or more searches, this appeal requires us to decide the constitutionality of the searches for which the Government conceded that any defendant had "standing." In particular, we must decide the constitutional merits of the searches of: 4049 Higbee and 5038 Homestead as to Joseph Doebley; 5022 and 5034 Homestead as to Michael Doebley; and 5019 Homestead as to Edward Stearn. Additionally, we must decide whether the District Court erred in concluding that the warrant for Edward Stearn's saliva was inadmissible as "fruit of the poisonous tree." Moreover, because the probable cause and good faith analyses are not defendant-specific, any search we deem to be constitutional will be upheld against all three defendants. By contrast, evidence from an illegal search is suppressed only against the defendants who are able to satisfy Rakas's "standing" prong.

IV.

We now consider the Government's arguments that each search was supported by probable cause, or at the very least,

27

good faith reliance on a validly issued search warrant.A.

We exercise plenary review over the District Court's evaluation of the magistrate's probable cause determination. United States v. Conley, 4 F.3d 1200, 1205 (3d Cir. 1993). By contrast, we conduct only a deferential review of the initial probable cause determination made by the magistrate. Illinois v. Gates, 462 U.S. 213, 236 (1983). This is the same deferential review the District Court should have conducted. Id. at 238-239.

The role of a reviewing court is not to decide probable cause *de novo*, but to determine whether "the magistrate had a substantial basis for concluding that probable cause existed." Id. at 238 (citation and quotation omitted). As we explained in Jones,

> [O]ur role is not to make our own assessment as to whether probable cause existed. Rather, we are constrained to determine only whether the affidavit provides a sufficient basis for the decision the magistrate judge actually made.

Jones, 994 F.2d at 1057. If a substantial basis exists to support the magistrate's probable cause finding, we must uphold that finding even if a "different magistrate judge might have found the affidavit insufficient to support a warrant." Conley, 4 F.3d at 1205. Although we do not merely "rubber stamp a magistrate's conclusions," Whitner, 219 F.3d at 296 (citation

28

and quotation omitted), we must heed the Supreme Court's direction that "doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." Gates, 462 U.S. at 237 n.10 (citation and quotation omitted).

Probable cause is a "fluid concept" that "turn[s] on the assessment of probabilities in particular factual contexts." Id. at 232. When presented with an application for a search warrant, the magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id. at 238. Although every affidavit ideally would contain direct evidence linking the crime with the place to be searched, a magistrate may issue a search warrant even without direct evidence. Probable cause can be, and often is, inferred from "the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide [evidence]." Jones, 994 F.2d at 1056 (citation and quotation omitted). Because probable cause is a "practical, nontechnical conception," we are concerned with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Gates, 462 U.S. at 231 (citation and quotation omitted).

1.

29

The Government argues, and we agree, that the District Court's probable cause analysis erroneously discounted the reliability of the confidential informant. In the Court's view, "[t]he affidavit contains not a shred of evidence regarding the reliability of the informant," and "provides no assertion the officers believed the confidential informant, no history of past cooperation by the informant, no drug buys by the informant, and no inside information supplied by the informant." Stearn, 548 F. Supp. 2d at 190, 192. On that basis, the Court gave no weight whatsoever to the informant's tip. This was error.

A magistrate may issue a warrant relying primarily or in part upon the statements of a confidential informant, so long as the totality of the circumstances gives rise to probable cause. Before the Supreme Court's decision in Gates, many courts held under the Aguilar-Spinelli doctrine that an informant's statements could not furnish probable cause unless the affidavit established both the informant's "veracity" and his "basis of knowledge." See Spinelli v. United States, 393 U.S. 410 (1969); Aguilar v. Texas, 378 U.S. 108 (1964). This standard was difficult to meet; as the Gates Court observed, "the veracity of persons supplying anonymous tips is . . . largely unknown, and unknowable," and consequently, "anonymous tips seldom could survive a rigorous application of either of the Spinelli prongs." Gates, 462 U.S. at 237. In the Court's view, "a conscientious assessment of the basis for crediting such tips is required by the Fourth Amendment," but "a standard that leaves virtually no

30

place for anonymous citizen informants is not." Id. at 238.

When the Gates Court abandoned the two-pronged Aguilar-Spinelli test, it reaffirmed the relevance of an informant's "veracity" and "reliability" but ruled that "these elements should [not] be understood as entirely separate and independent requirements to be rigidly exacted in every case." Gates, 462 U.S. at 230. Gates instead instructs that "a deficiency in one [element] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." Id. at 233. In particular, Gates endorsed independent "[police] corroboration of details of an informant's tip" as an important method for establishing a tip's reliability. Id. at 241.

On the facts of Gates, neither "veracity" nor a "basis of knowledge" was apparent from an informant's anonymous letter advising police that the Gates were drug dealers who stored large quantities of drugs in their home. In relevant part the informant's tip stated:

> Most of [their] buys are done in Florida. Sue [Gates, Lance Gates's] wife drives their car to Florida, where she leaves it to be loaded up with drugs, then Lance flys [sic] down and drives it back. Sue flys [sic] back after she drops the car off in Florida. May 3 she is driving down there again and Lance will be flying down in a few days

to drive it back. At the time Lance drives the car back he has the trunk loaded with over $ 100,000.00 in drugs.

Id. at 225. Even so, the Gates Court found probable cause to support a warrant where police investigation verified specific details of the tip. Police investigation confirmed that Lance Gates flew from Chicago to West Palm Beach, Florida on May 5 and checked into a room registered to Susan Gates. The next morning, Lance departed with an unidentified woman, heading toward Chicago in a Mercury bearing the Illinois license plates assigned to the Gates's Hornet station wagon. When Lance and Susan Gates arrived home twenty-two hours later, police executed warrants to search their car and home. Those searches produced vast quantities of marijuana, weapons and other contraband.

The Illinois Supreme Court affirmed the suppression of this evidence, reasoning that even when supplemented by police investigation, the anonymous tip did not meet the two-pronged Aguilar-Spinelli test. Rejecting that test, the Supreme Court upheld the searches, holding that "the judge could rely on the anonymous letter, which had been corroborated in major part by [police] efforts." Id. at 215. The police corroboration of all of the letter's predictions about the Gates' peculiar travel, by plane and car, to and from Florida, "indicated, albeit not with certainty, that the informant's other assertions also were true." Id. at 244. This corroboration provided a "substantial basis for

crediting the hearsay" because it "reduced the chances of a reckless or prevaricating tale." Id. at 244-245 (citations and quotations omitted). Even though police investigation corroborated only "seemingly innocent activity," that activity "became suspicious in light of the initial tip." Id. at 243 n.13 (citations and quotation omitted). Above all, Gates affirmed "the value of [police] corroboration of details of an informant's tip" as a viable basis for crediting the hearsay tip of a confidential informant. Id. at 241.

As in Gates, the magistrate judge in this case had a "substantial basis for crediting the [informant's] hearsay" tip because the tip was corroborated in significant part by independent police investigation. Id. at 245 (citations and quotations omitted). As set forth above, the informant alleged that Joseph Doebley sold drugs "in weight" with his brother Michael, and that Edward Stearn was his supplier. Crucially, officers corroborated Joseph Doebley's drug involvement when they observed the confidential informant consummate a controlled buy of 3.5 grams of cocaine from Joseph Doebley at the intersection of Higbee and Cottage. One week later, officers obtained additional corroboration when they observed a white male depart the Comly gym after speaking with Doebley, sell 3.5 grams of cocaine to another white male, return to 4808 Comly, and count and deliver cash to Joseph Doebley. Just as the informant alleged, both sales were "in weight."

33

Police investigation additionally confirmed the credibility of the informant's statement that Joseph Doebley's cocaine business was operated from a gym on the 4800 block of Comly Street. Consistent with the informant's allegations, real estate records indicated that Joseph Doebley owned 4808 Comly, and police confirmed that Joseph Doebley had installed a gym at that location. Additionally, police connected 4808 Comly with both of the drug deals documented in the affidavit, as Joseph Doebley left that property before the controlled buy and received proceeds there after the apparent sale through an agent.

The informant also demonstrated knowledge of Joseph Doebley's home and cars. The informant averred that Joseph Doebley maintained a home on the 4000 block of Higbee Street, and that he operated a blue-and-white pickup truck and a rust-colored Impala. Real estate checks revealed that 4049 Higbee was owned by Jane Betty Doebley – an obvious relation of Joseph Doebley – and on October 4 he apparently spent the night there after entering at will. Consistent with the tip, police later observed Joseph Doebley operating each of the vehicles.

Likewise, police corroborated elements of the informant's tip relating to Michael Doebley and Edward Stearn. In particular, the informant told police that Edward Stearn lived on the 5000 block of Homestead, which officers confirmed when they learned that Edward Stearn owned 5019 Homestead. Additionally, police confirmed that Edward Stearn had three

prior arrests for possession with intent to distribute. The affidavit reported that Michael Doebley had two such arrests. That information corroborated the informant's allegations about Michael Doebley and Edward Stearn because "[t]he use of prior arrests . . . is often helpful" to establish probable cause, particularly where "the previous arrest or conviction involves a crime of the same general nature as the one which the warrant is seeking to uncover." Conley, 4 F.3d at 1207.

Officers' October 5 surveillance additionally corroborated, albeit circumstantially, the informant's statement that Joseph Doebley, Michael Doebley and Edward Stearn worked together in drug-dealing operations. That afternoon, Stearn's residence at 5019 Homestead appeared to be a focal point of Joseph and Michael Doebley's movements among properties on Homestead Street and Higbee Street. Michael Doebley was seen departing 5019 Homestead and driving to 4808 Comly, the location with the strongest nexus to the two documented drug deals. Michael Doebley entered 4808 Comly and left with Joseph Doebley; both men returned to and entered 5019 Homestead. Joseph Doebley then exited 5019 Homestead, entered 5022 Homestead and returned to 4808 Comly with an unidentified white male. Joseph Doebley then returned to Homestead Street and again entered 5019 Homestead; thereafter he entered 5017 Homestead and used keys to enter 5022 Homestead and 5028 Homestead. Although not direct evidence, we find circumstantial corroboration of the informant's tip in the

Doebley brothers' peculiar shuttling among these properties and their frequent stops at 4808 Comly, which police had linked to two drug deals. We take guidance from Gates, which instructs that "[if] an informant is right about some things, he is more probably right about other facts." Gates, 462 U.S. at 244 (quoting Spinelli, 393 U.S. at 427 (White, J., concurring)). We therefore find no merit in Edward Stearn's assertion that the magistrate lacked a substantial basis for crediting the informant's tip insofar as it suggested that evidence would be found at 5019 Homestead.

Contrary to the District Court's conclusion, the police officers' corroboration was not insufficient because it related only "innocent details" or details available to the "casual observer." Id. at 229; Stearn, 2008 WL 2550582, at *3. As an initial matter, Gates recognized that "seemingly innocent activity [might] bec[o]me suspicious in light of the initial tip," which demonstrably was the case here. Gates, 462 U.S. at 243 n.13 (citations and quotation omitted). Moreover, unlike the wholly innocent behavior observed in Gates, police in this case linked Joseph Doebley with two drug sales and confirmed the informant's claim that the Comly gym was linked to the defendants' drug activity. In our view, Michael and Joseph Doebley's "seemingly innocent" movements among the Comly gym and the homes on Homestead Street (including Edward Stearn's residence at 5019 Homestead) became suspicious in view of the initial tip and police confirmation that Joseph

36

Doebley sold drugs, sometimes using an agent, and apparently from the Comly gym. In view of the foregoing, we conclude that the magistrate judge had a substantial basis for crediting the informant's tip, and we defer to his decision to do so.

2.

When the crime under investigation is drug distribution, a magistrate may find probable cause to search the target's residence even without direct evidence that contraband will be found there. In a series of cases beginning with Whitner, 219 F.3d at 298, we recognized that "evidence associated with drug dealing needs to be stored somewhere, and . . . a dealer will have the opportunity to conceal it in his home. After all, a dealer could logically conclude that his residence is the best, and probably the only, location to store items such as records[,] . . . cash, . . . guns, . . . and large quantities of drugs to be sold." Our subsequent decisions in Hodge and Burton embraced this inference also. See Burton, 288 F.3d at 104 ("[I]t is a reasonable inference to conclude that drug dealers often store evidence of drug crimes in their residences[.]"); Hodge, 246 F.3d at 306 ("It is reasonable to infer that a person involved in drug dealing on such a scale would store evidence of that dealing at his home.").

The Government contends that the District Court erred in declining to apply the inference from Whitner, Hodge, and

Burton to find probable cause to search 4049 Higbee and 5038 Homestead (as Joseph Doebley's residences) and 5019 Homestead (as Stearn's residence). Although we postpone our discussion of whether these searches were ultimately supported by probable cause, we agree with the Government that the District Court's refusal to consider these cases resulted from its unduly restrictive parsing of our case law.

In its suppression order, the District Court ruled that the inference from Whitner, Hodge and Burton only applied

> when large quantities of drugs are involved, Whitner, 219 F.3d at 292; when sales are made in the vicinity of the dealers's [sic] houses, Hodge, 246 F.3d at 306; or when some other recitation in the affidavit support [sic] the inference a large-scale drug operation is involved. Burton, 288 F.3d at 105. None of those factors is present in this affidavit.

Stearn, 548 F. Supp. 2d at 192.

In its denial of the Government's motion to reconsider, the District Court clarified its view that the Burton inference applies only where there is no "suggestion that any of the defendants had any other place in which to hide their contraband." Stearn, 2008 WL 2550582, at *4. Applying that principle, the Court concluded that because the defendants

38

initiated drug deals from the 4808 Comly gym, it was "more reasonable" to infer that the gym was the situs of contraband. Id. at *5. In the Court's view, the searches violated the Fourth Amendment because the defendants' homes lacked a "recited nexus to the crimes alleged." Id. at *5.

Although we agree that the Fourth Amendment precludes the search of a home lacking a "nexus" to the alleged crimes, we disagree with the Court's assessment of what constitutes a nexus sufficient to justify a search. The starting point is that a magistrate judge may infer probable cause from "the type of crime, the nature of the items sought, the suspect's opportunity for concealment and normal inferences about where a criminal might hide . . . [evidence]." Jones, 994 F.2d at 1056. Proceeding from that premise, Hodge, Whitner and Burton permit the magistrate to infer from "the type of crime," "nature of the items sought" and the defendant's "opportunit[ies] for concealment" that a drug dealer in some circumstances may use his home to store evidence associated with drug dealing. Although the District Court's bright-line rules were based on factual elements present in Whitner, Hodge and Burton, the factual circumstances of those cases do not limit the inferences a detached magistrate is permitted to draw. We understand the District Court's inclination to read these cases narrowly, but we must reject its attempt to substitute bright-line rules for a more "fluid . . . assessment of probabilities in particular factual contexts." Gates, 462 U.S. at 232. Gates directs, and we agree, that probable cause is an inquiry "not readily, or even usefully, reduced to a neat set

39

of legal rules." Id.

United States v. Burton, 288 F.3d at 104, the most recent in this line of cases, acknowledged the limits of the Whitner-Hodge inference without resorting to bright-line rules. Although we reaffirmed the "reasonable inference . . . that drug dealers often store evidence of drug crimes in their residences," we held that "application of this inference is based on evidence supporting three preliminary premises: (1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's activities." Id. Burton answered a question both Whitner and Hodge left open – whether a magistrate judge may infer probable cause to search a defendant's residence solely from evidence suggesting that the defendant is a drug dealer.[12]

_____

[12]Whitner did not reach the question "whether the fact that Whitner appears to be a drug dealer is sufficient under the circumstances of this case to conclude that he would be likely to store evidence of his drug dealing at his residence." Whitner, 219 F.3d at 298. There, the "affidavit offer[ed] an additional important piece of evidence linking the crime to the [] location [to be searched]": the defendant's suspicious and deceptive responses to police questioning about his residence, which "logically suggest[ed] that Whitner was storing some evidence of illegal activity at the apartment." Id. at 298-299.

40

Burton's third prong answered this question in the negative. In demanding some evidence "that the home contains contraband linking it to the drug dealer's activities," we moored our "drug dealer" inferences back to the "practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, at 238; cf. United States v. Savoca, 739 F.2d 220, 224-225 (6th Cir. 1984). We recognized that the search of a drug dealer's home would be unreasonable if the affidavit suggested no reason to believe contraband would be found there.

---

Thereafter in Hodge, the affidavit also recited a "nexus" between the defendant's residence and the drug distribution crimes under investigation. We observed that the sheer quantity of crack cocaine possessed by the defendant (one-fourth to one-half of one kilogram) – suggesting large scale operation – gave rise to the inference that the defendant stored evidence at his home. Hodge, 246 F.3d at 306-307.That inference was buttressed by the circumstances that probable cause existed to arrest Hodge and that "Hodge's home was in the same city where he was to make [a] drug delivery, rendering his home a more likely repository of his drug-related paraphernalia." Id. at 307. Finally, we held that the magistrate was entitled to "give considerable weight" to the averment of the experienced affiant officer, who detailed his belief that the defendant's home would likely contain evidence. Id. (citation and quotation omitted)

41

Our case law, from Jones to Burton, suggests many factors that help establish the required nexus between a defendant's drug-dealing activities and his home. These include: large-scale operations,[13] a defendant's attempts to evade officers' questions about his address,[14] the conclusions of experienced officers "regarding where evidence of a crime is likely to be found,"[15] the proximity of the defendant's residence to the location of criminal activity,[16] probable cause to arrest the defendant on drug-related charges,[17] and the tip of a "concerned citizen" that a specific stolen item would be found in the defendant's residence.[18] Contrary to the District Court's ruling, these factors are not requirements. Nor are these factors exhaustive.

We similarly reject the District Court's assumption that

---

[13]Burton, 288 F.3d at 104; Hodge, 246 F.3d at 306.

[14]Burton, 288 F.3d at 104-105; Whitner, 219 F.3d at 298-299.

[15]Hodge, 246 F.3d at 307; see also Burton, 288 F.3d at 104.

[16]Hodge, 246 F.3d at 307.

[17]Id.

[18]Jones, 994 F.2d at 1056-1057.

42

a magistrate may not infer probable cause to search a drug dealer's residence if the dealer "had any other place in which to hide [his] contraband." Stearn, 2008 WL 2550582, at *4. As a logical matter, we recognize that a drug dealer's ready access to "private places" outside his home weakens the inference that his residence is "the best, and probably the only, location to store items." Whitner, 219 F.3d at 298. But even if another location is an equally likely repository of evidence, a magistrate may infer probable cause to search the drug dealer's home so long as the affidavit establishes a nexus between the dealer's home and the crime under investigation. As with the standard probable cause inquiry, a magistrate's task is simply "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238. We again reject the District Court's attempt to limit the "normal inferences [a magistrate may draw] about where a criminal might hide . . . [evidence]." Jones, 994 F.2d at 1056 (citation and quotation omitted).

B.


The Government contends that even if we agree that some or all of the searches were invalid, we must reverse the District Court's suppression order because the executing officers were entitled to rely in good faith on the warrants. We note at the outset that the Court's initial opinion relegated this most

43

critical issue to a three-sentence footnote, and that its second order repackaged the cursory footnote into two conclusory paragraphs. Although we will not here analyze the good faith exception with respect to the individual searches, the District Court's good faith analysis impels us to review the governing principles.

Even if the magistrate judge lacked a sufficient basis for his probable cause determinations, that fact alone does not warrant the "extreme sanction of exclusion." Leon, 468 U.S. at 926. In Leon, the Supreme Court established the good faith exception to the exclusionary rule, carefully tethering the exclusionary remedy to its overarching policy of "deterring official unlawlessness." Id. at 907 n.6 (citations and quotations omitted). Balancing the exclusionary remedy's "substantial costs" against its deterrent "benefits," Leon held that the exclusionary remedy was not justified where officers act in the "objectively reasonable belief that their conduct d[oes] not violate the Fourth Amendment." Id. at 918. If an officer obtains a warrant and executes it in good faith, "there is no police illegality and thus nothing to deter." Id. at 921. Accordingly, a court should not suppress evidence seized under a warrant's authority, even if that warrant is subsequently invalidated, unless "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." United States v. Zimmerman, 277 F.3d 426, 436 (3d Cir. 2002) (quoting Leon, 468 U.S. at 922 n.23).

44

Ordinarily, the "mere existence of a warrant . . . suffices to prove that an officer conducted a search in good faith," and will obviate the need for "any deep inquiry into reasonableness." Hodge, 246 F.3d at 308 (citing Leon, 468 U.S. at 922 n.23); Leon, 468 U.S. at 922 (citation and quotation omitted). Indeed, we neither expect nor require police to perform complex legal analysis in the field, for they are untrained in the law and are often called to make "hurried judgment[s]." Zimmerman, 277 F.3d at 436 (quoting Leon, 468 U.S. at 922 n.23). In "narrow circumstances," however, the good faith doctrine is not sufficient to override the warrant's lack of probable cause.[19]

---

[19]We have identified four narrow situations in which an officer's reliance on a warrant is not reasonable:

> (1) the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit;
>
> (2) the magistrate abandoned his judicial role and failed to perform his neutral and detached function;
>
> (3) the warrant was based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or
>
> (4) the warrant was so facially deficient that it

Relevant for our purposes, the good faith exception does not apply where the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Leon, 468 U.S. at 923 (citation and quotation omitted); Williams, 3 F.3d at 74 n.4. These are the rare circumstances in which, although a neutral magistrate has found probable cause to search, a lay officer executing the warrant could not reasonably believe that the magistrate was correct.

Although few of our cases ultimately condemn officers' reliance on a warrant as unreasonable, this "exception to the good faith exception" retains vitality in our Court. See Zimmerman, 277 F. 3d at 429; id. at 440 (Alito, J., dissenting). In Zimmerman, child pornography was seized pursuant to a warrant to search for both adult and child pornography, based on an affidavit's allegation that the defendant had shown adult pornography to a child some six to ten months prior. Id. at 429 (majority opinion). With little difficulty, we determined that no probable cause existed to search for either type of pornography: the affidavit contained no evidence suggesting the defendant possessed child pornography, and information linking the

----

       failed to particularize the place to be searched or
       the things to be seized.

Williams, 3 F.3d 69, 74 n.4 (3d Cir. 1993). This case implicates only the third exception to the Leon exception to the exclusionary rule.

defendant with adult pornography was stale. Id. at 432-436. We thereafter determined that the face of the warrant "preclude[d] reasonable reliance" because "[a]ny reasonably well-trained officer in the stationhouse shop would recognize [the affidavit] as clearly insufficient." Id. at 437 (citations and quotations omitted). As we explained,

> Leon . . . weakened the exclusionary rule, but it did not eviscerate it. Good faith is not a magic lamp for police officers to rub whenever they find themselves in trouble. . . . That aside, the good faith exception requires a sincerely held and objectively reasonable belief that the warrant is based on a valid application of the law to all known facts. The objective standard requires officers to have a reasonable knowledge of what the law prohibits.

Zimmerman, 277 F.3d at 437-438 (citations and quotations omitted).

To some degree we attribute the District Court's brusque good faith analysis to its conclusion that the affidavits were woefully insufficient to establish probable cause. Although we ultimately disagree with that conclusion, we do not necessarily view the Court's truncated good faith analysis as an error separate and apart from its probable cause determinations. Because the probable cause inquiry remains highly relevant to the reasonableness of an officer's reliance on a warrant, it may

47

be proper in some cases for a court to truncate its good faith analysis if an affidavit is truly "bare bones." See Leon, 468 U.S. at 926.

Notwithstanding the Court's probable cause conclusion, however, truncation of the good faith analysis was not proper here. As we have explained, the affidavit was a far cry from "bare bones," as the District Court characterized it. As in Leon, the supporting affidavit implicated the defendants via the tip of "a confidential informant of unproven reliability," and detailed officers' subsequent "extensive investigation," including verification of criminal, real estate and motor registry records, and observations of drug transactions and other activity evocative of drug dealing. Leon, 468 U.S. at 901. Of course, where multiple warrants are supported by a single affidavit, an otherwise detailed affidavit may nevertheless be "bare bones" with respect to some of the warrants sought.[20] But that demonstrably was not the case for every warrant the Ryan affidavit sought. To the contrary, Ryan's affidavit to some

---

[20]See United States v. Mayneng Xiong, No. 07-CR-112, 2007 WL 2703859, at *8 (E.D. Wis. Sept. 14, 2007) ("[O]ften a single affidavit setting forth facts to establish probable cause is submitted to the issuing judge in support of search warrants for several locations involved in one common investigation. In such case, the description of the places to be searched and the items to be seized are individualized and vary based on the location and supporting probable cause.").

48

degree linked *every* location with either drug activity or an alleged or confirmed drug dealer. See infra Part IV.C. Without a doubt, this affidavit was not so lacking in probable cause that, without analysis, the District Court could assume that each of the magistrate's probable cause determinations involved "a mere ratification of the bare conclusions of others." Gates, 462 U.S. at 239; see Zimmerman, 277 F.3d at 436-437.[21] On these facts, we reject the District Court's categorical approach to the good faith exception; here, a property-by-property analysis was

---

[21]See Gates, 462 U.S. at 239 (characterizing as "bare bones" the affidavit in Nathanson v. United States, 290 U.S. 41, 54 (1933), which stated only that the affiant "'has cause to suspect and does believe' that liquor illegally brought into the United States is located on certain premises"); id. (characterizing as bare bones the affidavit in Aguilar, 378 U.S. at 108, which included only "an officer's statement that '[affiants] have received reliable information from a credible person and do believe' that heroin is stored in a home"); see also, e.g., United States v. Leake, 998 F.2d 1359, 1367 (6th Cir. 1993) (finding "bare bones" an affidavit based on an anonymous tip where the investigating officer merely "posted himself outside the house for only two hours on two nights, where he observed absolutely nothing out of the ordinary"); United States v. Barrington, 806 F.2d 529, 531 (5th Cir. 1986) (characterizing as "bare bones" an affidavit stating "only that Captain Solomon 'received information from a confidential informant' who is 'known to Captain Phil Solomon and has provided information in the past that has led to arrest and convictions'").

required.

Additionally, the District Court's good faith analysis plainly charged the executing officers with a greater knowledge of the law than our precedent requires. Even though the District Court ultimately declined to credit the informant's tip and declined to apply the Burton inference to Joseph Doebley and Edward Stearn's residences, it did so only after a detailed analysis of our case law, analysis we neither expect nor require from "nonlawyers in the midst and haste of a criminal investigation." United States v. Ventresca, 380 U.S. 102, 108 (1965). Given the complexity of the District Court's probable cause analysis, we find untenable its categorical conclusion that no search could be upheld under the good faith exception.

C.

We now turn to the question whether the informant's tip, in conjunction with the evidence adduced by officers in subsequent investigation, afforded the magistrate with a substantial basis for determining probable cause existed to search each of the properties at issue. Mindful of our deferential standard of review, we inquire only whether the magistrate had a substantial basis for determining "there [was] a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238. Thereafter, for those

50

properties for which we determine the magistrate's probable cause determination lacked a substantial basis, we consider whether evidence from those searches is nevertheless admissible under the Leon good faith exception to the exclusionary rule.

### 1. 4049 Higbee Street

Applying the foregoing principles, we hold that the magistrate had a substantial basis for determining there was a fair probability that contraband would be found at 4049 Higbee. With respect to 4049 Higbee, the affidavit met each of the Burton prongs, justifying the inference that evidence of Joseph Doebley's drug-dealing activities would be found there. First, the affidavit provided powerful evidence that Joseph Doebley was a drug dealer. As set forth above, the affidavit detailed an informant's tip that Joseph Doebley was a drug dealer. Police then confirmed Joseph Doebley's involvement in two drug transactions: a controlled buy and a sale apparently made through an agent. (App. 88.)

Second, the affidavit contained ample evidence that 4049 Higbee was Joseph Doebley's home. The informant's tip, which we have deemed reliable, averred that Joseph Doebley resided in the 4000 block of Higbee Street. Investigating that tip, police confirmed that an apparent relative of Joseph Doebley owned a home at 4049 Higbee, reasonably suggesting that 4049 Higbee

51

was the home that the informant ascribed to Joseph Doebley. (Id.) Thereafter, while under police surveillance, Joseph Doebley apparently admitted himself into that residence: On October 4, 2005, he parked his blue-and-white pickup truck behind 4049 Higbee, "entered the rear yard of 4049 Higbee that contained a white pit bull," "opened the rear garage door," and "entered this location" at approximately 11:50 p.m. Police terminated surveillance at 12:30 a.m., but observed Doebley's pickup truck parked at the rear of 4049 Higbee at approximately 7:15 a.m. the next morning, suggesting that he remained there overnight. (Id.) This police surveillance, in the context of the informant's tip that Joseph Doebley lived on the 4000 block of Higbee, leads us to conclude that the affidavit afforded the magistrate with significant, though not conclusive, evidence that Joseph Doebley resided at 4049 Higbee. (Id.)

Third, the affidavit suggested a nexus between 4049 Higbee and Joseph Doebley's drug dealing activities. Principally, the informant's tip averred that Joseph Doebley sold drugs out of his 4808 Comly gym and his house on Higbee Street. (Id.) Police investigation substantially corroborated the informant's allegations regarding the Comly gym, suggesting the informant was also correct that Doebley sold drugs out of his Higbee Street home. In addition, Joseph Doebley apparently slept at 4049 Higbee the evening after he collected proceeds from a drug sale, suggesting the possibility that he entered that residence with drugs or drug-sale proceeds on his person. (See

id.) The magistrate may have additionally taken judicial notice that 4049 Higbee is a mere half-mile from the location of Joseph Doebley's September 28 drug sale, made at the intersection of Higbee and Cottage Streets. In fact, that sale occurred almost exactly halfway between the 4808 Comly gym and 4049 Higbee Street, on a virtually direct route.[22]

Finally, the magistrate may have inferred that 4049 Higbee would contain contraband because the affidavit suggested that it was part of a network of suspiciously titled homes and cars, each connected to at least one of the three defendants. During their investigation, police learned that four properties in the vicinity exhibited a peculiar pattern of co-ownership. From real estate records, police ascertained that 4049 Higbee was listed as a co-owner address for 5038 Homestead, which was owned by Ruth Nolan; 4049 Higbee also received water bills for that address. (Id.) Two other properties were similarly linked: property records showed that 5028 Homestead was owned by Patrick Fox, but listed 5019

_____

[22]Thus this was not a case in which the distance between the defendant's home and the location of the crime was so great as to render the defendant's home an implausible repository of evidence. Cf. Savoca, 739 F.2d at 224-225 (declining to apply the normal inference that known bank robbers conceal evidence in private places, because the robbery under investigation occurred more than 2,000 miles from the location searched).

53

Homestead as a co-owner address. (Id. at 89.) That property, in turn, was owned by Edward Stearn, who the informant alleged to be Joseph Doebley's dealer. (Id. at 88, 89.) In addition, the unusual circumstance that Joseph Doebley appeared to have at-will access to 5017, 5019, 5022, 5028, 5030 and 5038 Homestead reasonably suggested an even more substantial network of collectively or communally owned properties. (Id.)

This pattern extended to cars, too. The blue-and-white pickup truck operated by Joseph Doebley was registered not in his own name, but to one Steven Little. (Id. at 88.) The rust-colored Impala operated by Joseph Doebley was registered in his own name, but registration records listed an address in Richboro, Pennsylvania. (Id.) Similarly, the Jeep Grand Cherokee operated by Michael Doebley was registered in his own name, but the address on file was 5019 Homestead – Edward Stearn's home. (Id. at 89.)

From this unusual pattern of home co-ownership, access, and cross-listed addresses, the magistrate judge reasonably may have inferred that the defendants had a stronger connection to the properties and cars than was immediately apparent. The judge may have inferred an intent by the defendants' to conceal their true addresses. See Burton, 288 F.3d at 104-105; Whitner, 219 F.3d at 298-299 (noting that defendant's attempted concealment of association with home logically suggests the defendant "was storing some evidence of illegal activity [there] which he did not want the agents to discover"). Alternatively,

54

these facts may have suggested that the defendants deliberately obscured their ownership of the cars and homes at issue, perhaps to avoid criminal forfeiture. Cf. United States v. Tramunti, 513 F.2d 1087, 1102 (2d Cir. 1975) ("Experienced narcotics officers know . . . criminals are aware that cars used to transport narcotics or other contraband, if seized, are generally subject to forfeiture."). On this score, it would have been helpful if Officer Ryan had furnished his theory as to the import of these circumstances, which police apparently believed to suggest that the defendants owned cars and homes in the names of straws. (See e.g., Grand Jury Indictment ¶ 4-5; App. 53-54.) Even so, the affidavit's description of these ownership and title irregularities (of which 4049 Higbee was part) lends support to the inference that drugs would be found at 4049 Higbee. That inference, together with the informant's corroborated tip and 4049 Higbee's proximity to the Comly gym – the location of the controlled buy – provide a nexus sufficient to suggest "that the [4049 Higbee] home contain[ed] contraband linking it to the dealer's drug activities." Burton, 288 F.3d at 104.

Because the affidavit contained evidence meeting Burton's three "preliminary premises," we hold that a substantial basis existed for the magistrate's determination that probable cause existed to search 4049 Higbee. "To be sure, 'it would have been preferable if [Officer Ryan] could have supplied more information linking [4049 Higbee Street] to the criminal activity.'" Hodge 246 F.3d at 307 (quoting Whitner,

55

219 F.3d at 299). Nevertheless, "the fact remains that he did bring the evidence . . . to a magistrate judge, who determined that there was probable cause to issue the warrant[]." Id. (quoting Jones, 994 F.2d at 1057). In view of the "Fourth Amendment's strong preference for searches conducted pursuant to a warrant," we are further persuaded to uphold the search of 4049 Higbee. Id. (quoting Ventresca, 380 U.S. at 108).

## 2. 5019 Homestead Street & Stearn's Saliva

It is a closer question whether the magistrate had a substantial basis for concluding that the affidavit established probable cause to search Edward Stearn's home at 5019 Homestead. Though not overwhelming, the affidavit contained circumstantial evidence that Stearn was a drug dealer, raising the inference that contraband would be found in Stearn's residence. Notwithstanding this "common-sense inference," Burton directs that probable cause is established only if the affidavit contains evidence that (1) the defendant was a drug dealer, (2) the place to be searched was his home and (3) that home had a nexus to the defendant's drug activity. In our view, the affidavit adequately supports the second and third "preliminary premises" of Burton. It is a close question, however, whether the affidavit contained adequate evidence to support Burton's first "preliminary premise" – that Stearn was a drug dealer – to raise the inference that drugs would be stored at his home. Consequently, we will resolve 5019 Homestead

56

under the Leon good faith exception, and we uphold the search on those grounds.

The strongest evidence that Stearn was a drug dealer was the confidential informant's assertion that Stearn was Joseph Doebley's supplier. (App. 88.) Although the affidavit did not directly corroborate this aspect of the informant's tip, the informant's demonstrated accuracy in other regards lends credibility to this assertion. In light of the tip, circumstantial evidence supported the inference that Stearn was a drug dealer, including Joseph and Michael Doebley's access to 5019 Homestead and its apparent centrality to their October 5 shuttling among Homestead Street properties and the Comly gym. (Id. at 89.) Also relevant were Stearn's three prior drug distribution arrests and 5019 Homestead's apparent relationship to 5028 Homestead and Michael Doebley's vehicle. (Id. at 88-89.) Indeed, even Stearn's conspicuous association with Joseph Doebley, a known drug dealer, supports the inference that Stearn was involved in the drug trade. See Burton, 288 F.3d at 104 (quoting Whitner, 219 F.3d at 298).

Although Burton does not specify the quanta of evidence required to support each "preliminary premise," we are mindful that the evidence that Stearn was a drug dealer is weaker than the evidence marshaled against the defendants in Whitner, Hodge, and Burton. In the Whitner affidavit, the affiant stated that the defendant "had been arrested as a result of a controlled

delivery of 5.75 pounds of methamphetamine." Whitner, 219 F.3d at 298. As described in the Hodge affidavit, on an informant's tip, officers were present at the defendant's scheduled delivery of crack cocaine; when he saw them, he fled, dropped his drugs near a trash can, and was immediately arrested. Hodge, 246 F.3d at 304. Finally, according to the Burton affidavit, a wired, reliable informant attempted to purchase drugs from a drug dealer under investigation, but inadvertently interrupted an apparently major drug transaction between that dealer and the defendant. Burton, 288 F.3d at 94-95. We found probable cause to search the defendant's home based on the informant's account, officers' statements that they observed the defendant deposit a plastic bag in his trunk, and our conclusion that the affidavit furnished probable cause that the defendant was a drug dealer. Id. at 104. Here, by contrast, the affidavit did not directly connect Stearn to an actual drug transaction, and did so only through a confidential informant and circumstantial corroboration.

Burton, of course, calls only for "evidence supporting [the] preliminary premise[]" that the defendant is a drug dealer, of which we certainly have some. Id. at 104. Additionally, we believe Burton's second and third prongs are easily met. Indeed, the affidavit indicated that Stearn was 5019 Homestead's record owner and connected 5019 Homestead to the drug allegations via the informant's tip, the Doebleys' apparent at-will access and 5019 Homestead's peculiar relationship with both 5028

58

Homestead and Michael Doebley's Jeep. (App. 89.) But wary of carrying our Burton inference too far, we decline to decide whether "these facts and the inferences to be drawn from them reasonably could lead a magistrate judge to conclude that [Stearn] was involved in the drug trade." Whitner, 219 F.3d at 298. Because the parties neither briefed nor argued this issue in detail, we will resolve the propriety of the 5019 Homestead search under the good faith exception.

Contrary to the District Court's assertion, the affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," either across the board or with respect to 5019 Homestead. Zimmerman, 277 F.3d at 436-437. As set forth above, the affidavit contained evidence on all three prongs of Burton, although evidence on the "drug dealer" prong was weaker than that adduced in Whitner, Hodge and Burton. But even if we determined that the evidence against Stearn was insufficient to invoke Burton, "the officers could not be expected to know that the magistrate judge made an erroneous probable cause determination due to insufficient evidence connecting [Stearn's] house to drug dealing." Hodge, 246 F.3d at 309 (citation and quotation omitted). "Indeed, the magistrate judge himself could not know whether this Court would ultimately agree with his determination given the unsettled jurisprudence governing cases of this type." Id. Accordingly, we conclude that the search of 5019 Homestead "presented a close call. Once the magistrate

59

judge made that call, it was objectively reasonable for the officers to rely on it." Id.

Our decision to uphold the search of 5019 Homestead compels us to reject the District Court's conclusion that the warrant for the collection of Stearn's saliva is fruit of the poisonous tree. See Smith, 522 F.3d at 306 n.2 ("In light of the result that we reach here that the seizure and search were lawful, there was no 'poisonous tree.'"). Because he challenged only the search of 5019 Homestead, it is irrelevant for Stearn whether the warrant for saliva was obtained as a consequence of an illegal entry into another location. See Rakas, 439 U.S. at 134 ("[I]t is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the [exclusionary] rule's protections."); Wong Sun v. United States, 371 U.S. 471, 488 (1963) (predicating exclusion of evidence as "fruit of poisonous tree" on the existence of a primary constitutional violation). Because Stearn made no alternative probable cause argument in his motion to suppress, we will reverse the District Court's suppression of Stearn's saliva sample. (See App. 107-108.)

### 3. 5038 Homestead Street

Likewise, we will uphold the search of 5038 Homestead under the Leon good faith exception. Considering the affidavit, the most plausible theory linking 5038 Homestead with drug

activity is that it was owned or otherwise possessed by Joseph Doebley. See Burton, 288 F.3d at 104. As with the previous searches, the affidavit contains some evidence on each of Burton's three preliminary premises. See id. The first prong is easily satisfied; independent police surveillance confirmed that Joseph Doebley was a drug dealer.

Although we do not necessarily deem it sufficient for probable cause purposes, the affidavit contained some evidence as to Burton's second prong. Indeed, the informant alleged that Joseph Doebley lived on Higbee Street, police investigations suggested he resided at 4049 Higbee, and 4049 Higbee was the co-owner address of 5038 Homestead (and received its water bill). In this regard, we believe the magistrate (or executing officers) may also have inferred Joseph Doebley's ownership interest from the broader network of ownership and title irregularities, described above, of which 5038 Homestead was part. In addition, Joseph Doebley's autonomous ingress and egress into 5038 Homestead, detailed by the affidavit, suggested that he had some degree of dominion over the property.[23]

---

[23]The affidavit recites: "Doebley was observed on State rd and followed onto 5000 Homestead St and observed entering 5038 Homestead St . . . at 9:15pm. At approx. 11:30pm Doebley was observed leaving 5000 Homestead St operating the blue/white pick up truck . . . ." (App. 88.) Because the affidavit generally reported the instances in which the defendants were

Finally, although not necessarily sufficient for probable cause, the affidavit also demonstrated a nexus between 5038 Homestead and Joseph Doebley's drug activities. According to the affidavit, Joseph Doebley spent two hours at 5038 Homestead within four hours of apparently receiving the proceeds of a drug sale from an unidentified white male. (App. 88.) A magistrate reasonably may have inferred that he entered 5038 Homestead in possession of drugs or drug proceeds, which he may have stashed during the two hours he remained inside the dwelling. Additionally, 5038 Homestead is located on the same block as Edward Stearn's home. According to the informant, whose tip was extensively corroborated by independent police investigation, Edward Stearn is Joseph Doebley's supplier. We have held that geographic proximity can contribute to a nexus between the crime and the location to be searched. Hodge, 246 F.3d at 307 ("Hodge's home was in the same city where he was to make the anticipated drug delivery, rendering his home a more likely repository of his drug-related paraphernalia.") (citation omitted); cf. Jones, 994 F.2d at 1057 ("[A]ll three defendants' homes were on St. Croix and thus were relatively near the site of the crime, making all of their homes a likely repository for evidence.").

If we were reviewing the facts in the first instance, we are

---

accompanied by third parties, Joseph Doebley likely entered 5038 Homestead alone.

unprepared to say that this evidence would satisfy the Burton three-prong test. Nevertheless, we simply cannot say that the officers were unreasonable in relying on the magistrate's probable cause determination. Critically, the affidavit adduces some evidence for each Burton prong and, of crucial importance, the issuing magistrate made a finding of probable cause. On these facts, we cannot conclude that the affidavit was so egregiously lacking in probable cause that a police officer, untrained in the law, should have declined to execute the warrant. See United States v.$92,422.57, 307 F.3d 137, 146 (3d Cir. 2002). We will reverse the District Court's suppression of evidence seized from 5038 Homestead.

4. 5022 Homestead Street

The search of 5022 Homestead also falls within the good faith exception to the exclusionary rule. Although not overpowering, the affidavit contained some circumstantial evidence suggesting that the defendants, and particularly Joseph Doebley, may have used 5022 Homestead to store drugs and paraphernalia. At approximately 4:45 p.m. on October 5, 2005, police officers observed Michael Doebley leave 5019 Homestead for 4808 Comly. Thereafter, both Doebleys departed 4808 Comly, arrived at the 5000 block of Homestead, and entered 5019 Homestead. Joseph Doebley then left by himself and entered 5022 Homestead. While Joseph Doebley remained inside, an unidentified white male entered 5022 Homestead.

63

Both men departed 5022 Homestead in the white male's automobile and traveled to 4808 Comly. From there, Doebley drove back in his own car to the 5000 block, and entered 5019, 5017, 5022 (using keys) and 5028 Homestead (using keys). After that, he entered 5030Homestead with an unidentified white female, and then entered 5022 Homestead, remaining there until 8:15 p.m.

Without deciding the issue of probable cause, we are confident that the affidavit contained sufficient indicia of probable cause to satisfy the good faith exception to the exclusionary rule. See Zimmerman, 277 F.3d at 436-438. In all, the affidavit demonstrates that Joseph Doebley accessed 5022 Homestead three times during a four-hour period during which the Doebleys entered the Comly gym and five different properties on Homestead. One property – 5019 Homestead – was owned by Edward Stearn, who was alleged by the confidential informant to deal drugs from that residence. Another was 4048 Comly, which was a confirmed situs of Joseph Doebley's drug activities. On the afternoon in question, both of these properties were accessed multiple times, as was 5022 Homestead.

In addition, the affidavit suggests that Joseph Doebley exercised some degree of control over 5022 Homestead. His repeated entries were apparently at-will, he appeared to receive another individual at the property, and on at least one occasion,

he entered with a key. As discussed with respect to 5038 Homestead, this evidence potentially raises the Burton inference that Doebley used 5022 to store drugs and paraphernalia. See Burton, 288 F.3d at 104. Without deciding whether these circumstances meet the three prongs of Burton, we believe a police officer would be warranted in believing that the magistrate's probable cause determination rested on the Burton inference. Because the warrant to search 5022 Homestead was supported by much more than a "bare bones" assertion that evidence would be found there, we will uphold that search under the good faith exception.

## 5. 5034 Homestead Street

The District Court suppressed evidence from 5034 Homestead as fruit of the poisonous tree because it was a product of Ryan's second affidavit, which detailed the returns on four searches the Court deemed unconstitutional. See Stearn, 548 F. Supp. 2d at 193. But because we uphold those searches, the warrant to search 5034 Homestead Street cannot be said to exploit a primary invasion of any defendant's Fourth Amendment rights, and is not fruit of the poisonous tree. See Smith, 522 F.3d at 306 n.2. Our inquiry, therefore, is whether Ryan's second affidavit afforded the issuing bail commissioner with a substantial basis for finding probable cause, or whether the good faith exception applies. Without deciding the close question of probable cause, we will uphold the search of 5034

Homestead under the <u>Leon</u> good faith exception.

The second affidavit put before the bail commissioner compelling evidence that Stearn and the Doebleys were large-scale drug dealers who maintained a network of stash houses. The search of 5019 Homestead produced proof of residence for Edward Stearn, bulk cocaine powder, money, pills, marijuana, and mail for Michael Doebley. (App. 96.) The search of 5038 Homestead produced eight kilograms of cocaine, fifteen handguns, and "proof of residence for Michael Doebley." (App. 96.) The search of 5022 Homestead produced marijuana and packaging. (App. 96.) The search of 4049 Higbee produced a firearm, marijuana, packaging paraphernalia and documents for Joseph Doebley. (App. 96.) The vast quantities of drugs, firearms, and packing equipment, combined with the documents for Michael Doebley found at 5019 Homestead and 5038 Homestead, further corroborated the informant's tip that the three defendants were part of one drug-dealing enterprise. In addition, this evidence suggested the defendants were using houses on Homestead Street to store drugs and paraphernalia. A plausible inference is that on October 5, when the Doebleys accessed and entered a number of Homestead properties, they were actually moving through properties they used as stash houses.

Although evidence linking 5034 Homestead with the defendants' drug activity is not overwhelming, it is more than

colorable. Officers did not see any defendant enter 5034 Homestead until just before the first set of warrants was executed on October 6 when Michael Doebley and Edward Stearn apparently fled from Homestead Street. (App. 96.) After a federal raid on a nearby establishment, Michael Doebley left 5019 Homestead (with Stearn) and went to 5022 Homestead, and then to 5038 Homestead. (Id.) Afterward, he entered 5034 Homestead and returned to 5022 Homestead, and then both he and Stearn departed from Homestead Street after loading bags into their respective vehicles. (Id.) Although grudgingly, even the District Court conceded that a magistrate might have inferred "flight by the suspects from Homestead Street." Stearn, 548 F. Supp. 2d at 191. With that inference in mind, we believe Michael Doebley's pre-flight stop at 5034 Homestead, together with the incriminating fruits of the other Homestead Street searches, support the inference that 5034 Homestead would also contain drugs and paraphernalia.

That inference is even more plausible given the affidavit's later suggestion that Michael Doebley had a possessory interest in 5034 Homestead. According to the affidavit, as officers were preparing to secure 5034 Homestead pending application for a warrant, one Sophia Beltz identified herself as the owner of the property. (App. 96.) When asked for keys, she said that she wouldn't know who had keys, and that

67

the only person who is in the property is Michael Doebley.[24] Because the affidavit earlier indicated that Michael Doebley was detained after departing Homestead Street, a magistrate may have reasonably construed Beltz's statement to suggest Michael Doebley was the possessor of 5034 Homestead. This of course would strengthen the inference that he stored drugs there. See Burton, 288 F.3d at 104.

Without deciding whether this nexus is sufficient for probable cause, we easily uphold this search under the Leon good faith exception. On these facts it is plain that the warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Zimmerman, 277 F.3d at 436-437; see Leon, 468 U.S. at 923. We will uphold this search under the good faith exception to the exclusionary rule.

### Conclusion

Because the searches of 5019 Homestead, 5022

---

[24]The affidavit recites: "5034 Homestead was about to be secured by P/O Nicoletti #4620 when a W/F who ID herself as Sophia Beltz said she was the owner. Beltz was asked for keys ands [sic] stated she wouldn't know who had keys but the only person who is in the property is Michael Doebley." (App. 96.)

68

Homestead, 5034 Homestead, 5038 Homestead and 4049 Higbee did not violate the Fourth Amendment, evidence seized from those searches shall not be suppressed as to any defendant. Except for 5020 Homestead, from which no evidence was seized, we will reverse the District Court's suppression order in its entirety, all in accordance with the foregoing.

: