**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2346

_____

UNITED STATES OF AMERICA

v.

TROY ALEXANDER,
                                Appellant
_____

On Appeal from the United States District Court
For the District of Delaware
(D.C. No. 1-19-cr-034-001)
District Judge:  Honorable Colm F. Connolly
_____

Argued
June 29, 2022

Before:  JORDAN, PORTER, and PHIPPS, *Circuit Judges*

(Filed: November 30, 2022)
_____

Janet M. Bateman
Mary K. Healy   [ARGUED]
Office of Federal Public Defender
800 N. King Street – Ste. 200
Wilmington, DE   19801
        *Counsel for Appellant*

Carly A. Hudson   [ARGUED]
Office of United States Attorney
1313 N. Market Street
P.O. Box 2046
Wilmington, DE   19899
        *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Troy Alexander appeals the denial of his motion to suppress evidence against him in this drug trafficking case.  As a general principle, evidence unlawfully obtained cannot be used in court.  But the suppression of evidence under that exclusionary rule has exceptions, and two of them are implicated here.  Namely, if the evidence in question would inevitably have been discovered anyway, or if a late but lawful search warrant was issued, suppression may not be warranted.  The purpose of the exclusionary rule is to deter police misconduct that violates the Fourth Amendment.  That deterrence, however, comes at the cost of keeping relevant evidence out of the fact-finding process, and that is a bad

bargain when the evidence would have come to light through other, lawful means.

The police entered the homes of both Alexander and his girlfriend, without search warrants. In law enforcement parlance, the officers at each location conducted a "hit-and-hold;" that is, they entered and secured the premises before getting a warrant, a tactic sometimes used to respond to emergency circumstances. Once inside, and having secured the premises, the officers at Alexander's home waited to conduct a search until a warrant for that house was issued. Those who entered Alexander's girlfriend's home likewise secured the premises and were in the process of applying for a warrant, which was all but certain to issue, when they received what they understood as consent to a search. Because the government has shown that the evidence from both locations would have been discovered in any event, we need not consider the lawfulness of the hit-and-holds or subsequent searches, and we will affirm the District Court's denial of the motion to suppress.

## I.  BACKGROUND[1]

### A.  The Criminal Investigation

In October 2018, DEA agents met with a confidential informant who told them that Alexander was involved in drug trafficking and, more specifically, had access to multiple kilograms of cocaine, had sold cocaine to him in the past, and

_____

[1] The following account is drawn from the record created at the suppression hearing, including the District Court's findings of fact.

3

was known to possess firearms. The informant provided the address of Alexander's home in downtown Wilmington – 728 East Sixth Street (the "Residence") – where Alexander lived with his sister. He also informed the agents that Alexander's girlfriend lived in the same vicinity. Some of the details about Alexander were corroborated by Paul Lawrence, an officer with the Newark, Delaware, Police Department who was assigned to work with the DEA.[2]

A task force created by the DEA then arranged for the confidential informant to make a controlled purchase of cocaine from Alexander on November 19, 2018.[3] Before the purchase, there were three phone calls between the informant and Alexander. During the first call, which agents were able to record, the informant asked to buy cocaine, and Alexander said that he would be ready in an hour. Alexander told the informant to meet him then on the 700 block of East 6th Street in Wilmington. The second call was made by Alexander to the informant, who answered it outside the presence of task force officers, so it was not recorded. On the third call, the informant

---

[2] Among other things, Officer Lawrence corroborated the address of the Residence and Alexander's phone number, the latter of which was subsequently used to set up a controlled drug buy with the confidential informant.

[3] The task force "consisted of agents from the DEA, agents from the U.S. Department of Homeland Security, and Delaware police officers[.]" (App. at 414.) We variously refer to the task force members as "officers," "agents," or "members."

called Alexander, but the officers were only able to record the informant's end of the conversation.[4]

On the day of the sale, the officers outfitted the informant with an audio and video recording device and provided him with $900 to exchange for the drugs. They then set up a surveillance perimeter. Approximately twenty minutes later, agents observed Alexander leave the house at 722 East 7th Street, one block from the Residence, and walk to meet the informant. The officers later learned that this second house was where Alexander's girlfriend, Venus Nelson, lived, and that Alexander used it as a stash house (the "Stash House") for his drug trafficking business.[5] The task force officers on the scene witnessed Alexander give the informant what later tested to be almost 115 grams of cocaine in exchange for the $900. Unbeknownst to the task force, the informant had placed the recording device in his pocket during the sale, so no video was captured. The device did, however, record the conversation, and, during the exchange, Alexander told the informant that the price of the cocaine was $2,300, so the informant still owed him $1,400.

Nine days later, on November 28, the officers instructed the informant to arrange another purchase of cocaine. He did

---

[4] The record is devoid of any information about what was said during the second and third calls.

[5] The confidential informant had not previously identified the Stash House by address, but as noted earlier, he had informed the officers that Alexander's girlfriend lived near the Residence.

so, and, during a recorded phone call, Alexander explained that he was in Philadelphia and would not return to Delaware until 7:00 that evening.[6]  Anticipating Alexander's return, the task force set up surveillance outside both the Residence and the Stash House.

The officers on surveillance duty made several observations between 6:30 and 8:30 that night.  They first saw Alexander arrive at the Residence, park his car on the side of the road, and carry into the house a large, heavy, white bag. About two minutes later, he emerged with a smaller white bag that he appeared to struggle to carry.  He took that bag to the Stash House and entered using his own key.  After a few minutes, he returned to the Residence empty-handed.  At that point, following DEA instructions, the confidential informant called Alexander to offer the money still owed on the first transaction.  Alexander responded that he would get it from the informant the next day.  He also told the informant that he didn't have "anything" for him but "might be ready tomorrow."  (App. at 61, 417.)  Alexander then went to the Stash House again and came out carrying a large black trash bag, which he brought back to the Residence.

---

[6] According to the District Court, the task force believed that Alexander's trip to Philadelphia was significant for two reasons.  First, the informant had previously told agents that Alexander procured his drugs from Philadelphia.  Second, the DEA and local police were generally aware that Philadelphia was a "source city for drugs sold in northern Delaware."  (App. at 415-16.)

Events took an unexpected turn about an hour later, when a Kia Optima pulled up to the Residence and the passenger went inside. The passenger left the Residence at 8:13 p.m., carrying what appeared to be the same black trash bag that Alexander had brought from the Stash House. The Kia drove off, and officers in unmarked cars followed. At 8:21, when the Kia was far enough away to be out of sight of anyone at the Residence, the officers attempted to effect a traffic stop. It did not go as planned. "The Kia came to a momentary stop, but then successfully fled the scene, smashing into several of the officers' vehicles in the process." (App. at 418.)

### B. The Warrant Application

Meanwhile, throughout the evening, officers at the scene had been providing contemporaneous updates to Officer Lawrence, who was at the DEA's office in New Castle, Delaware. He began drafting an affidavit in support of search warrants for the Residence and the Stash House, based on "Alexander's movements [between the two], the monitored calls with the [confidential informant], the … controlled drug buy, and the task force officers' general knowledge that Philadelphia is a source of supply for drugs sold in Wilmington[.]" (App. at 417.) At 8:20 p.m. – just after the Kia had driven away from the Residence – he emailed a draft affidavit to a federal prosecutor. That draft was later supplemented to include a description of the car chase. The affidavit also stated that "agents have already entered the residence based on exigent circumstances and have detained its occupants," but no further details were provided. (App. at 63.)

7

### C. The Hit-and-Holds

After the Kia escaped, things happened fast. The officers watching the Residence saw Alexander leave it while speaking on his cellphone and then drive off in his car. The surveillance team believed he "may have been tipped off by the Kia occupants," so at around 8:30 p.m., they simultaneously entered both the Residence and the Stash House, although they still had no warrants. (App. at 419.) An agent on the scene, Anthony Salvemini,[7] later explained their thought process: "We didn't know where [Alexander] was. … [T]here had been a car chase, so it was somewhat of an urgent scenario." (App. at 299.) The officers' primary concern, he said, was preventing the destruction of evidence in the houses. They thus "entered both houses, performed protective sweeps, and handcuffed the occupants to [en]sure the safety of law enforcement and prevent the destruction of evidence while search warrants were being obtained." (App. at 419.)

#### 1. *The Stash House*

Up to eight task force officers forcibly entered the Stash House wearing ballistic vests and with guns drawn. Within a few seconds, Ms. Nelson, Alexander's girlfriend, appeared at the top of the stairs. The officers instructed her to come down, which she did, and they put her in handcuffs and told her to remain in the living room. According to Agent Salvemini, Nelson appeared "naturally surprised" but eventually "calmed down." (App. at 305, 419-20.)

---

[7] Salvemini is an agent with the DHS who specializes in drug investigations and works in partnership with the DEA.

Within five minutes of their entry, they had checked all three floors of the Stash House, checking for other occupants. Agent Salvemini then introduced himself to Nelson, who was still in handcuffs. He told her that they "were in the process of applying for a search warrant[.]" (App. at 420.) When he asked about evidence of drug dealing, her response was only that "there were some firearms upstairs that belonged to her, but they were legal[.]" (App. at 420.)

While they were talking, an officer approached Agent Salvemini and whispered that he had seen a large amount of cocaine and drug paraphernalia in plain view in the basement. Agent Salvemini then told Nelson that, although she had a right to refuse, he did not think it would be a problem to get a warrant, and "it would save everybody a lot of time" if she consented to a search. (App. at 306, 420.) Nelson replied, "go ahead and search the house." (App. at 306, 420.) With that, the search began, and no warrant application was submitted for the Stash House. Officers recovered "powder and crack cocaine, cutting agent, two scales, and a kilogram press with molds." (App. at 423.) They also seized "two handguns and an extended magazine[.]" (App. at 423.)

2. *The Residence*

Simultaneous with the hit-and-hold at the Stash House, another group of officers entered the Residence. There, they encountered Alexander's sister and another person, both of whom they handcuffed. After a safety-sweep of the premises, the officers waited inside the Residence for close to three hours, until a magistrate judge signed a search warrant. During the execution of that warrant, officers seized about $67,000 in

9

cash, two handguns, 285 rounds of ammunition, a digital scale, a Rolex watch, two diamond chains, and documents that listed the residence as Alexander's address.

### D.     The Arrest

Rewinding to approximately 8:48 p.m. – not long after the hit-and-holds were executed – Alexander approached the Stash House on foot.  Four officers were stationed in front, and Alexander told them, "I heard you guys were looking for me.  I don't want my sister or anyone else to get in trouble.  All that stuff in there is mine." (App. at 287, 423-24.)  Officers arrested him and placed him in a DEA car, where Agent Salvemini read him his *Miranda* rights.

At around 9:00 p.m., officers brought Alexander to a DEA office where he was placed in a holding cell.  Officer Lawrence, who was told that Alexander had already been read his *Miranda* rights, introduced himself as the primary case agent.  Alexander responded: "I don't want my girl to get in any trouble … anything in there is mine." (App. at 425.)  A little later, Alexander asked to speak to Officer Lawrence again, and he gave a recorded interview taking responsibility for and describing the details of his drug-dealing operations.  Before he did that, Alexander was advised of his *Miranda* rights for a second time, which he acknowledged.  He was released from custody that evening.

### E.     The Motion to Suppress

A few months later, a federal grand jury returned a four-count indictment that charged Alexander with possession with intent to distribute twenty-eight grams or more of cocaine base,

in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B); possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and possession of a firearm by a prohibited person, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

Alexander eventually moved to suppress all the evidence seized from the Stash House and the Residence. He first argued that the searches violated the Fourth Amendment, because no valid consent was given to search the Stash House, and because the warrant for the Residence was based on mere speculation and false statements.[8] Later, in a supplemental filing, Alexander also moved to suppress "all custodial incriminating statements made by him to law enforcement" as obtained in violation of the Fifth and Sixth Amendments.[9] (App. at 73.)

---

[8] In particular, Alexander claimed that Officer Lawrence's affidavit falsely asserted that the task force possessed "numerous monitored and recorded telephone conversations" between the informant and Alexander, when in fact only one recording captured both sides of a conversation. (App. at 101.) He also challenged the affidavit's representation that the officers possessed a video recording of the drug sale when, in fact, the video portion of the recording only captured the inside of the informant's pocket.

[9] For ease of reference, we refer to the original and supplemental filings as a single motion to suppress.

11

The District Court held an evidentiary hearing on the motion, at which Officer Lawrence testified to the warrant's veracity, stating that he had drafted the substance of the affidavit prior to the officers' warrantless entry and that he had intended to file the same affidavit in support of warrants for both the Stash House and the Residence. He also confirmed that the affidavit was based on calls between the confidential informant and Alexander, a recording of a controlled buy between those two, and the officers' surveillance of the Stash House and the Residence.

The government also had DEA agent Antonio Tiberi testify. He was standing outside the Stash House when Alexander "walk[ed] hastily" toward it and claimed ownership of "[a]ll that stuff in there." (App. at 287.) The government next called Agent Salvemini to the stand. He testified that both houses were entered "[a]s close to simultaneous[ly] as possible," and he gave the specifics of the hit-and-hold at the Stash House. (App. at 298.)

Defense counsel called two witnesses at the suppression hearing: Nelson and Alexander. Nelson testified that Alexander stayed with her in her home approximately four days a week. According to Nelson, the officers conducted a search of her home before asking her for consent, and, when she eventually was asked for consent, she was not informed of her right to refuse. On cross-examination, she testified about her relationship with Alexander, agreeing that "if he needed anything, [she] would be right there[.]" (App. at 336.)

Alexander testified about his dealings with the government's informant. He stated that the two of them never discussed a drug transaction on the day Alexander was in

12

Philadelphia. He also claimed that the bag the officers saw him carrying between the Residence and the Stash House contained jewelry, not drugs. Finally, he testified he only admitted that the evidence seized from the Stash House was his because an officer told him Nelson was "going down for the stuff found in the house[.]" (App. at 353.)

### F. The District Court's Denial of the Motion to Suppress

At the conclusion of the hearing, the District Court denied the motion to suppress. Among other things, the Court found that, while Officer Lawrence's affidavit may not have been perfect, Alexander had overstated its inaccuracies. There were, the Court said, "no misstatements … [and] no omissions" in it. (App. at 379.)

In a subsequent written opinion, the District Court elaborated on its earlier in-court rulings. It concluded that, prior to the hit-and-holds, there was probable cause to believe Alexander had cocaine and drug-dealing paraphernalia in the Residence and the Stash House. It further found that "the officers had reason to believe that Alexander and anyone in the [R]esidence or Nelson's home had been tipped off about the officers' failed attempt to stop the Kia and thus the officers had reason to believe that any cocaine or related evidence of drug dealing in the [R]esidence or Nelson's home would be imminently destroyed." (App. at 430.) Thus, the Court said, there were exigent circumstances justifying the officers to enter without a warrant.

The Court determined that the search of the Residence was valid because a warrant was properly issued. And, as for

the validity of the warrantless search of the Stash House, that was upheld as being based on Nelson's consent. The Court observed that, "[a]lthough the task force had already entered the house, detained Nelson, and performed a protective sweep, there is no indication that those actions put undue pressure on Nelson." (App. at 433.) It credited Agent Salvemini's testimony over Nelson's, ultimately holding that her consent and the search were valid. It also rejected Alexander's attempt to suppress his incriminating statements on the basis of supposed Fifth and Sixth Amendment violations.

Alexander ultimately pled guilty to Counts One, Two, and Four of the indictment, and the parties stipulated to a sentence of 132 months, which the Court entered. The plea agreement expressly preserved Alexander's right to appeal the denial of the motion to suppress, which he timely did.

## II. DISCUSSION[10]

On appeal, Alexander continues to challenge the constitutionality of the warrantless entry into the Residence and the Stash House and argues that the results of the subsequent searches must be suppressed. While he vigorously

---

[10] The District Court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. We review "the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercise[] plenary review of the District Court's application of the law to those facts." *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002). In the context of warrantless searches, we review de novo the determination of probable cause. *Ornelas v. United States*, 517 U.S. 690, 691 (1996).

14

contests the justification for the officers' actions, as well as the validity of Nelson's consent to search the Stash House, we do not need to reach those issues because we choose to affirm the District Court on alternative bases. *Watters v. Bd. of Sch. Dirs.*, 975 F.3d 406, 412-13 (3d Cir. 2020). We do so because, even if we were to agree with Alexander that the circumstances were not truly exigent or that Nelson did not provide valid consent, the independent source doctrine and the doctrine of inevitable discovery nevertheless support admission of the evidence from the searches of the Residence and the Stash House, respectively.

As more fully described herein, the independent source doctrine covers the evidence found in the Residence, because the officers pursued and ultimately obtained a valid search warrant based solely on information gathered prior to their entry. And the search of the Stash House is similarly shielded under the inevitable discovery doctrine, because the officers were far enough along in the warrant application process that, had they not received what they believed to be consent, a warrant would have issued and the evidence would have been found. The District Court's denial of Alexander's motion to suppress was therefore correct.[11]

---

[11] Alexander does not now advance any arguments under the Fifth and Sixth Amendments. He instead asserts more generally that any statements he made following the task force officers' search and seizure must be suppressed. As discussed herein, to the extent he is making an argument under the Fourth Amendment's fruit-of-the-poisonous-tree doctrine, which generally requires suppression of evidence that is derived from an illegal search or seizure, it similarly fails. *See Utah v. Strieff*, 579 U.S. 232, 237-38 (2016) (recognizing the

### A. Evidence Obtained from the Residence, and the Independent Source Doctrine

We first consider the evidence obtained at the Residence. Our analysis addresses two questions; first, whether there was a substantial basis to say there was probable cause to support the warrant that was prepared before but issued after the entry there, and second, whether the warrant supported the subsequent search notwithstanding the warrantless entry. The answer to both is yes. There was probable cause to support a search, based on an objective likelihood of criminal activity going on at the Residence. And the later-issued warrant justified the warrantless entry because the warrant was based only on information obtained before task force members ever entered the home. It therefore established a lawful, independent source for obtaining the evidence found there. So, even if exigent circumstances did not justify entering the Residence without a warrant (an issue we do not address), the independent source doctrine allows denial of the motion to suppress as to that evidence.

### 1. *The Warrant to Search the Residence was Supported by a Sufficient Showing of Probable Cause*

To obtain a search warrant, the government must present probable cause that evidence of criminal activity will be found in the place to be searched. *See Smith v. Ohio*, 494 U.S. 541, 542 (1990) ("[T]he Fourth Amendment … proscribes

independent source and inevitable discovery doctrines as exceptions to that doctrine).

– except in certain well-defined circumstances – the search of [a] property unless accomplished pursuant to judicial warrant issued upon probable cause."). That standard requires that there be "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause "is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232. Determining whether probable cause is met depends on "the basis and strength of an officer['s] … belief … that an article subject to seizure can be found at a particular location – in short, whether criminal activity is afoot." *United States v. Vasquez-Algarin*, 821 F.3d 467, 476 (3d Cir. 2016).

Here, however, we are not being asked to judge a probable cause showing in the first instance. Rather, we must consider the propriety of the probable cause finding made by the magistrate judge who issued the warrant. Accordingly, we need not "determine whether probable cause actually existed, but only whether there was a substantial basis for finding probable cause." *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001) (internal quotation marks omitted) (quoting *United States v. Jones*, 994 F.2d 1051, 1054 (3d Cir. 1993)). We answer that question by looking at the information submitted to the magistrate judge in Officer Lawrence's affidavit. *Id.*

Doing so, it is easy to conclude that a substantial basis existed for the finding of probable cause. Alexander argues that the failure of the informant to record video (as opposed to just audio) of the controlled purchase, when considered along with Alexander's statement to the informant that he "did not

17

have 'anything'" for the informant (App. at 61), shows that any evidence of drug dealing is insufficiently linked to the Residence, precluding a finding of probable cause. To the contrary, however, there were ample reasons for the magistrate judge's determination that evidence of drug trafficking was likely to be found in the Residence. Those reasons include the informant's statements about Alexander's drug dealing, the controlled purchase in the vicinity of the Residence, Alexander's return to the Residence from Philadelphia where officers believed he had received new drug supplies, the very fact that Alexander lived there and was seen going back and forth between the Residence and the Stash House with heavy bags in hand, and the Kia's destructive flight from police after its passenger left the Residence with one such bag. Those facts provided more than adequate support for a finding of probable cause. *See United States v. Stearn*, 597 F.3d 540, 558 (3d Cir. 2010) ("When the crime under investigation is drug distribution, a magistrate may find probable cause to search the target's residence even without direct evidence that contraband will be found there.").

## 2. *The Independent Source Doctrine Applies*

The more challenging question is whether the search warrant can serve as an independent source for the evidence discovered after the officers' warrantless entry into the Residence, so as to cleanse the entry of any potential unconstitutionality. Although there are unanswered questions about whether hit-and-hold procedures like the ones employed here adequately respect our constitutional guardrails, the independent source doctrine is sufficient, on this record, to overcome the general rule that would require suppression of

the evidence obtained from the Residence if the entry or search were illegal.

"[U]nder the independent source doctrine, evidence that was in fact discovered lawfully, and not as a direct or indirect result of illegal activity, is admissible." *United States v. Herrold*, 962 F.2d 1131, 1140 (3d Cir. 1992) (emphasis omitted); *see also Segura v. United States*, 468 U.S. 796, 805 (1984) ("[T]he exclusionary rule has no application [where] the Government learned of the evidence 'from an independent source.'" (second alteration in original) (quoting *Wong Sun v. United States*, 371 U.S. 471, 487 (1963))). The basis for the doctrine is "the well-established principle that evidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is so attenuated as to dissipate the taint." *United States v. Perez*, 280 F.3d 318, 338 (3d Cir. 2002) (internal quotation marks omitted) (quoting *Segura*, 468 U.S. at 797). The Supreme Court in *Murray v. United States* advised that, when a potentially illegal entry is followed by an "independently obtained search warrant," the evidence obtained pursuant to that warrant or "observed in plain view at the time of [the] prior illegal entry" need not be suppressed. 487 U.S. 533, 535, 537 (1988). The Supreme Court made clear that a subsequent search warrant is not independently obtained if law enforcement decided to seek the warrant due to information gathered from the initial, unlawful entry, or if information obtained from the initial unlawful entry influenced the magistrate judge's decision to issue the warrant. *Id.*; *see also United States v. Stabile*, 633 F.3d 219, 243-44 (3d Cir. 2011) (citing *Herrold*, 962 F.2d at 1140).

Here, the search warrant was issued based on information obtained before the officers entered the building, and thus, under *Murray*, the independent source doctrine is applicable. In *Murray*, officers illegally forced their way into a warehouse, without a warrant, where they "observed in plain view numerous burlap-wrapped bales that were later found to contain marijuana." *Id.* at 535. They left and later returned, after receiving a search warrant. *Id.* at 535-36. The warrant was based on information obtained prior to the illegal entry and did not mention that entry. *Id.* at 536. The Court explained that suppression is not appropriate for "evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." *Id.* at 537, 541-42; *accord United States v. Huskisson*, 926 F.3d 369, 374-76 (7th Cir. 2019) (collecting cases and "agree[ing] with several other circuits that, to determine whether the inclusion of tainted evidence in the warrant application affected the magistrate's decision to issue a search warrant, we evaluate whether the warrant application contained sufficient evidence of probable cause without the references to tainted evidence, even when that tainted evidence was recovered from an illegal entry into a home").

That standard is met here. The officers' decision to seek a warrant was, as in *Murray*, not prompted by anything witnessed during their warrantless entry. *Murray*, 487 U.S. at 542. And the information obtained during that warrantless entry was not included in the affidavit, which was premised solely on lawfully obtained, pre-search evidence. *Id.* Alexander's only rebuttal to the force of that reasoning is to repeat his earlier argument that "law enforcement lacked probable cause to believe contraband would be found in [his] residence." (Reply Br. at 15.) But, as already discussed, the

search warrant was supported by probable cause and was valid. Because the independent source doctrine controls, Alexander is not entitled to have the evidence obtained from the Residence suppressed.

### B. Evidence Obtained from the Stash House, and the Inevitable Discovery Doctrine

Analysis of the government's actions at the Stash House is more complicated because the officers never actually applied for a warrant and instead conducted a full search of the property after getting what they took to be consent from Nelson. Even so, the doctrine of inevitable discovery applies to bar exclusion of the evidence seized there. It is undisputed that the investigating officers had substantially progressed in their application for a warrant to search the Stash House. That application, had it been completed, was sufficient to demonstrate probable cause.

#### 1. *Probable Cause Existed to Search the Stash House*

Alexander disputes that there was probable cause to believe evidence of drug dealing was in the Stash House.[12] He

---

[12] In the District Court, the government contested Alexander's standing to challenge the search of the Stash House. The Court effectively rejected that argument, finding that Alexander stayed overnight at the Stash House at least four times a week, had a key to the Stash House, and could enter it at will. *See Rakas v. Illinois*, 439 U.S. 128, 143-44 (1978) (holding that Fourth Amendment protections turn on the legitimate expectation of privacy). Nevertheless, the Court

contends that the informant did not direct the task force officers there and that their surveillance did not sufficiently show any illegality at that location. Again, the record weighs against him.

Officer Lawrence's affidavit showed the following: Alexander exited the Stash House immediately before selling cocaine to the informant; Alexander traveled to Philadelphia, which is where the informant said Alexander procured drugs; Alexander told the informant he "might be ready" the next day (App. at 61); Alexander carried heavy bags in multiple trips between the Stash House and the Residence; a visitor left the Residence with a bag that appeared to originate from the Stash House; and that visitor entered the Kia and evaded the police in a car chase shortly thereafter. Those facts are enough to support the conclusion that there was probable cause to believe the Stash House contained evidence of illegal drug trafficking. *See Stearn*, 597 F.3d at 556-58 (holding that the magistrate judge properly credited an informant's tip in granting a search warrant because the tip was circumstantially corroborated by surveillance observations of the property in question showing

---

invited the government to provide further briefing on the issue, which the government did not do, nor has it pursued the issue on appeal. We take the government's silence as a concession that Alexander has standing. *See United States v. Stearn*, 597 F.3d 540, 551 n.11 (3d Cir. 2010) ("Fourth Amendment 'standing' is one element of a Fourth Amendment claim, and does not implicate federal jurisdiction. Consequently, 'standing' can be conceded by the government, and it is also subject to the ordinary rule that an argument not raised in the district court is waived on appeal." (internal citation omitted)).

that it was the "focal point of [certain co-conspirators']
movements among properties").

## 2. *The Inevitable Discovery Doctrine Applies*

The question then becomes whether a search warrant
would have inevitably issued if the warrant application had
been submitted. We conclude that, because there was probable
cause to search the Stash House, and because an affidavit was
fully drafted and ready to submit at the time of the hit-and-
hold, a search warrant was surely forthcoming and discovery
of the evidence inside the home was inevitable. In so holding,
we emphasize that there was probable cause for a warrant and
that the government had taken nearly all of the steps necessary
to acquire a warrant when it received what it perceived to be
Nelson's consent.

The key question under the inevitable discovery
doctrine is whether "the Government has shown by a
preponderance of the evidence that routine police procedures
inevitably would have led to the discovered" evidence. *Stabile*,
633 F.3d at 245. Our focus is on "historical facts capable of
ready verification, and not speculation." *Id.* at 246 (quoting
*United States v. Vasquez De Reyes*, 149 F.3d 192, 195 (3d Cir.
1998). Decisions from our sister circuits have looked to two
factors that we agree are most salient here: the likelihood of a
warrant issuing, and how far into the application process the
government was when its pursuit of a warrant was cut off. *See,
e.g.*, *United States v. Hughes*, 640 F.3d 428, 440 (1st Cir. 2011)
("The troopers had support staff on stand-by, ready to apply for
a warrant, and the warrant issued the next day. That was
sufficient for the inevitable discovery doctrine to take

23

hold[.]"); *United States v. Are*, 590 F.3d 499, 507 (7th Cir. 2009) ("[I]t is reasonable to conclude that the officers would have sought a warrant to search the bedroom and, once they had, it is virtually certain that a warrant would have been issued."); *United States v. Lamas*, 930 F.2d 1099, 1103 (5th Cir. 1991) (finding it relevant that, "at the time of the warrantless search, the officers had begun actively to pursue a warrant").

In this case, Officer Lawrence drafted a single affidavit in support of warrants to  search both the Residence and the Stash House.  Although the affidavit was only submitted in pursuit of a warrant for the Residence, that submission resulted in a warrant being issued and executed within three hours of the Stash House search.  On this record, then, it appears inevitable that, if the officers had chosen to wait for a warrant, one would have issued and the result here would have been the same.  *Cf. Nix v. Williams*, 467 U.S. 431, 444 (1984) ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received.").

Inevitability is a high threshold, but the government has crossed that threshold here:  it consistently pursued a lawful means of searching the Stash House and made significant progress toward that end.  Indeed, ordering suppression in this case would not further any deterrence justification.  *See Stabile*, 633 F.3d at 246 ("[T]he very fact that the Government attempted to secure state and federal search warrants at every step of the search indicates that there would be little deterrence benefit in punishing the Government.").

Our holding here should not be read to categorically condone hit-and-hold procedures justified after the fact by an in-progress warrant application.  Rather, we are guided by the specific facts of this case.  If, for example, the task force had less vigorously pursued a search warrant for the Stash House, or if we had doubts as to whether their decision to halt that process was based on something other than a genuine belief that Nelson had consented to a search, our holding today might be different.  *Cf. United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006) ("[W]e conclude that illegally-obtained evidence will be admissible under the inevitable discovery exception to the exclusionary rule only where a court can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor.").  In short, the inevitable discovery doctrine is not an open invitation for the government to conduct and then justify warrantless searches.  It is instead a narrow doctrine that the government cannot prospectively plan on accessing.[13]

---

[13] That the doctrine is applicable on this record, though, can be seen by comparison with the decision *United States v. Lamas*, 930 F.2d 1099 (5th Cir. 1991).  There, the police entered a home based on their perception of exigent circumstances to secure the scene until a warrant could issue.  *Id.* at 1100-01.  It was a hit-and-hold, in practicality if not in name.  *See id.* at 1101-03 ("[T]he officers initially entered [the defendant's] house solely for the purpose of securing it until a warrant could be obtained.").  Although an affidavit had not yet been drafted, one of the officers left the scene to work on getting a warrant.  *Id.* at 1101, 1103.  After the officer's departure, the other officers got what they took to be consent from the homeowner to conduct a search.  That perceived

25

## III. CONCLUSION

Because a warrant for the Residence was independently and lawfully obtained, the evidence found there is not subject to suppression. Similarly, evidence from the Stash House would have been inevitably obtained regardless of whether Nelson actually gave consent, and regardless of the officers' warrantless entry, so the evidence found there will also not be suppressed. We will therefore affirm the District Court's denial of Alexander's motion to suppress.

---

consent cut short the warrant process. *Id.* at 1101-03. Nevertheless, the government was able to demonstrate that probable cause would have supported a warrant, and the court was persuaded "that the officers – absent [the defendant's] consent – would have discovered the damning evidence pursuant to a search warrant." *Id.* at 1104; *see also United States v. Cunningham*, 413 F.3d 1199, 1204-05 (10th Cir. 2005) (applying the inevitable discovery doctrine where police "had focused their investigation on [two homes], and had drafted an affidavit to support a search warrant for one of these homes," but stopped pursuing a warrant for the other home based on supposed consent).